**In re BENNETT, REMICK & BENNETT, a Joint Venture Partnership consisting of Martha W. Bennett, Douglas B. Remick & Steven M. Bennett, Debtor.**

Bankruptcy No. 87–20781.

United States Bankruptcy Court, D. Montana.

March 11, 1988.

James C. Bartlett, Kalispell, Mont., for debtor.

John J. Connelly, James A. Lodoen, Lindquist & Vennum, Minneapolis, Minn., for First Nat. Bank of St. Paul.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 case, filed on December 15, 1987, a secured creditor, The First National Bank of St. Paul, Minnesota, has filed a Motion to Dismiss the case on grounds the filing of the petition was not in good faith, and there is not an existing partnership of the Debtor. In the alternative, the Bank seeks a declaration that the sole asset of the Debtor is no longer an asset of the estate, and therefore there is no reasonable prospect of rehabilitation of the Debtor. Hearing, after due notice on the motion, was held on February 18, 1988, and both parties have submitted briefs in support of their respective positions. The Debtor resists the motion and claims this Chapter 11 case will result in a liquidating Plan of Reorganization of the sole asset of the Debtor so that the filing was indeed made in good faith.

The salient facts, except for the existence of a legal partnership, are not in dispute. The sole asset of the Debtor is 21,-647 shares of stock held in the First National Bank of Libby, which shares represent about a 20% interest of the outstanding stock of the Libby Bank. A 62% majority interest in the Libby Bank is held by a holding company called Kootenai Bancorp, Inc. Of the Debtor's shares in the Libby Bank, 20,462 shares are represented by Certificate No. 1158, dated October 1, 1987, and issued by the Libby Bank to "Martha W. Bennett, Steven M. Bennett and Douglas B. Remick, as joint tenants with right of survivorship and not as tenants in common". Certificate No. 1158 was issued at the request of a First Bank officer who possessed stock powers of transfer from previous owners from whom Bennett, Bennett and Remick (Bennett et. al.) had purchased the shares through a financing arrangement between the Debtor and First Bank. It is on the basis of that financial dealing that the Bank now seeks dismissal of this Chapter 11 case.

Shortly before July 17, 1986, Douglas Remick approached the Bank for a loan of $645,344.52 to purchase the 20,462 shares

held by Douglas Remick, his father Bernard Remick and Darrell K. Olson, together with relations of Bernard Remick. The Bank approved the loan, and a note, security agreement, pledge agreements and stock assignments, were executed for the above amount by the three individuals, Martha Bennett, Steven Bennett and Douglas Remick, after submission of individual personal financing statements. The June, 1986, note was renewed, after some payments, by note dated January 31, 1987, again signed individually by the three borrowers, upon conditions which included the right of First Bank to sell the stock in the event of default in the payment of the note. The renewal note payable April 30, 1987, went into default, which resulted in the Bank notifying the borrowers that the stock would be sold to satisfy the obligation. After delaying sale on two occasions on request of the borrowers, who had attempted to sell the stock beginning early in 1987, the Bank on October 20, 1987, notified each borrower that the stock would be sold on December 16, 1987. After publication of the sale, together with notification of sale to fifty bank officers and ten holding companies, Kootenai Bancorp submitted a sealed bid for the stock. The Debtor, on December 15, 1987, through counsel, requested the Bank to delay the sale for 30 days, to allow the borrowers more time to sell the stock, to which the Bank assented. Nevertheless, the Debtor on December 15, 1987, filed this Chapter 11 case under the partnership of Bennett, Remick and Bennett, which has now delayed the sale due to the automatic stay provisions of Section 362 of the Code. The Kootenai Bancorp bid was opened and revealed a bid of $773,-855.00 or $37.78 per share. The Debtor testified they are desirous of seeking $60.00 to $75.00 per share. The Bank officer who negotiated the loan at the Bank testified he never knew of the existence of any partnership, and had he possessed such knowledge, would not have made the loan due to Bank policy. No Articles of Partnership have been presented in evidence and of the many notes, security agreements, purchase agreements, checks, stock powers and certificates presented in evidence, the only written evidence of the existence of a partnership is a copy of 1986 Internal Revenue Service Tax return, filed by "Bennett, Remick, Bennett" as a partnership. Indeed, each promissory note executed by the borrowers contains the printed matter "Name of Borrower if Corporation or Partnership", yet each note is signed individually, without any designation of a partnership name. Further, a purchase agreement of January 10, 1986, between Douglas B. Remick, Steven M. Bennett and Martha W. Bennett, signed by each individually, recites the parties are "jointly purchasing stock in the First National Bank of Libby, Montana, with an intent to acquire controlling interest in the same * * * ". Again, the Debtor failed to submit any joint venture agreement between the parties or books and accounts of the partnership, although they contend there is a partnership between them. The bankruptcy petition describes the Debtor as a "Joint Venture Partnership consisting of Martha W. Bennett, Douglas B. Remick and Steven M. Bennett", with tax Identification No. 81–0431902. Due to the holding of the Court on the Motion to Dismiss on the issue of good faith, I do not deem it necessary to decide whether the Debtor is a partnership or merely an association of three individuals.

■ The Court has been provided a copy of the transcript of the Section 341 first meeting of creditors held on February 17, 1988, at which Douglas Remick and Martha Bennett testified upon request of the First Bank after the Debtor's counsel announced he would not call or interrogate any of the Debtors. Upon reading of the transcript, it is readily apparent the entire purpose of the meeting was frustrated by the refusal of the Debtor's principals to either refuse to answer pertinent questions about the financial affairs of the Debtor or plead they did not know or recollect. For example, when showed a copy of the Purchase Agreement described above, and asked whether that agreement forms the basis of the partnership, Remick answered, "I will not answer to that". No records were brought to the meeting on which Remick or

Martha Bennett could refresh their recollection, and the entire stonewall effort is reflected in the statement of Debtor's counsel at the first meeting of creditors, Mr. Hash, who stated, "The entire [partnership] file is with Mr. Bartlett (Debtor's counsel at the hearing on February 18, 1988), and he's the attorney that's going to be representing them in trial in Missoula tomorrow". When questioned about the loan due Glacier National Bank for the 1,187 shares of Libby Bank stock, and who signed the note and security agreement, Remick answered, "I don't know right now. I didn't bring any of the records". The schedules fail to describe when the debt was incurred, so the inquiry by Bank's counsel was clearly pertinent and necessary. Again, Remick was asked and answered:

"Q. Who does the partnership books and records?

A. I do.

Q. You have them with you here?

A. I didn't—no, I don't.

\* \* \* \* \* \*

Q. So, the partnership has books and records but you don't have them here today?

A. Right."

I note the books have yet to be produced to the Court or creditors, even though they were subpoened for both hearings. Finally, the following colloquy represents the Debtor's responses to creditors at the 341 meeting, to-wit:

"Q. You don't feel that you have any duty or obligation to respond to my questions here today?

A. No. That very issue will be addressed tomorrow."

When Martha Bennett was called as a witness by the Bank, she answered continually, "I don't know", even as to partnership debt listed owing to Bernard Remick for $33,000.00. The other partner Steven Bennett was not present. At the conclusion of the testimony, the following took place:

"MR. CONNELLY: We would like to make a record that we're asking for production of certain documents for the hearing tomorrow, without need for a subpoena of them. The partnership records, the tax returns, any documents having to do with any other written agreement, other than this January 26th about Articles of Partnership.

MR. MATTIOLI: Including any correspondence that Mr. Remick would testify to disclose the partnership status and financial statements, etc. In other words, any documents tending to support their allegations that a partnership exists, which, by the way, we couldn't have known given that schedule, couldn't be disclosed.

MR. HASH: I guess I'd object on two grounds, one, that the hearing has already been closed. We formally closed it. Two, I don't believe that you filed the proper procedure in it. Three, if you'd like to talk to Mr. Bartlett, you may.

MR. CONNELLY: Is Mr. Bartlett in town?

MR. HASH: No, he isn't.

MR. CONNELLY: Where is he?

MR. HASH: Out of town.

MR. CONNELLY: Where, out of town?

MR. HASH: Out of state.

MR. CONNELLY: Does anybody have a number where he can be reached?

MR. HASH: No, all I can say is he'll be at the hearing tomorrow."

Of course, the Court, under Section 341(c) of the Code is barred from attending a first meeting of creditors so as to remove the Court from administrative matters and to end its involvement in situations in which the Court learns information outside of the context of a dispute on which it may eventually rule. H.R.Rep. No. 595, 95th Cong., 1st Sess. 331 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. While there are no specific statutory provisions concerning the conduct of the meeting of creditors, Bankruptcy Rule 2003(b)(1) states in part:

"\* \* \* The business of the meeting shall include the examination of the debtor under oath \* \* \*."

*Norton Bankruptcy Law & Practice on Bankruptcy Rules* (1987), Rule 2003, P. 108, states:

"It is a feature of modern bankruptcy legislation that creditors are given an opportunity to meet the debtor face to face and are accorded the right to inquire about the debtor's financial status through examination, to inquire into the debtor's conduct, financial affairs, and any other matters which are relevant to the administration of the debtor's estate, including factors which bear on an individual debtor's right to a discharge or to the dischargeability of any particular obligation. This feature was always considered essential in order to assure creditors an opportunity to determine what action, if any, should be taken by them to protect their respective interests."

Section 343 of the Code specifically provides that "The debtor shall appear and submit to examination under oath at the meeting of creditors under section 341(a) of this title". Section 343 was derived from former Section 21a of the former bankruptcy Act and as to the latter section, the United States Supreme Court stated in *Bronston v. United States*, 409 U.S. 352, 357, 93 S.Ct. 595, 599, 34 L.Ed.2d 568 (1973):

"The need for truthful testimony in a Section 21a bankruptcy proceeding is great, since the proceeding is 'a searching inquiry into the condition of the estate of the bankrupt, to assist in discovery and collecting the assets, and to develop facts and circumstances which bear upon the question of discharge'. *Travis v. United States*, 123 F.2d 268, 271, (CA 10 1941)."

I have discussed the Debtor's conduct at the § 341 meeting because I conclude the evasive manner of divulging facts to the inquirer bears upon the good faith issue presented in this case. In other words, a debtor must be open, honest and straightforward in any proceedings dealing with the administration of the estate, and failure of that conduct by the debtor should pique the Court's interest as to whether the bankruptcy process is indeed being abused.

The Debtor's schedules show that the only asset is 21,647 shares of stock in the Libby Bank. The Debtor lists three creditors, First Bank owed $617,211.19, Glacier National Bank, owed $59,200.00, and Bernard Remick owed $33,000.00. First Bank is secured by 20,462 shares of the stock, while Glacier Bank is secured by 1,185 shares of stock, which the Debtor values at $60.00 per share. I note that at the hearing on February 18, 1988, the Debtor called under subpoena the president of the Libby Bank, who produced written evidence that recent sales of the Libby Bank stock ranged from $40.00 to $44.00 per share, and that the book value of the Libby Bank is $44.00 per share, which is also its present market value. Kootenai Bancorp owns 62% of the Libby Bank, and offered to purchase the 20,462 shares of stock owned by Debtor at $37.78 per share. The evidence further shows that the only income of the Debtor is from dividends paid on the Libby Bank stock of $40,000.00 per year, which is not sufficient to cover the interest due on the secured obligations.

The bankruptcy schedules show the Debtor has no cash on hand, no open bank account balances, no accounts receiveable, no inventory, no real property and no other tangible personal property except the shares of stock in the Libby Bank. As to the debt owed Bernard Remick, the evidence is contradictory. The schedules are incomplete as to the nature or date of the claim. Douglas Remick testified the debt arose from the assumption of a note by the partnership owed by Bernard Remick to Glacier National Bank. Evidently the debt arose back in 1986 when the Debtors purchased the stock of the Libby Bank. However, the 1986 income tax return shows no current accounts payable or current liabilities, and lists only mortgages, and bonds payable in one year or more of $942,785.00. Whether the Bernard Remick debt is included in that sum is not clear from the record.

I now turn to whether this Chapter 11 case was filed in good faith and I quote from *In re Turner*, 71 B.R. 120, 122–123, 4 Mont.B.R. 136, 140–141, 142 (Bankr.Mont. 1987):

"There is in the Code an implied requirement of good faith in the filing of any bankruptcy petition. *In Re 2218 Blue-*

*bird Ltd. Partnership,* 41 B.R. 540, 542 (Bankr.S.D.Calif.1984). A number of courts have held that bad faith—i.e., filing under Chapter 11 with the intent to abuse the reorganization process—is sufficient 'cause' under Section 1112 to dismiss a case. *In Re 405 N. Bedford Dr. Corp.,* 778 F.2d 1374, 1377 (9th Cir.1985); *In Re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (BAP 9th Cir.1983); *In Re Asbridge,* 61 B.R. 97 (Bankr.N.D.1986). Good faith is not defined in the Code, but rather requires an examination of all the particular facts and circumstances in each case. The BAP in *Thirtieth Place, Inc.,* at 505, adopted the following standard:

'Whether it [good faith] exists in any case depends upon the facts and circumstances presented. No one evidentiary fact can be given paramount weight in deciding the question. If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization upon a feasible basis ... good faith cannot be denied.'

\*    \*    \*    \*    \*    \*

Admittedly, it is not a novel approach to file a bankruptcy petition to frustrate a foreclosure. As previously stated from case law on the subject, the Court must examine all the circumstances of the case, but three main factors Bankruptcy Courts have considered are: (1) the timing of the filing of the petition; (2) the motive of the Debtor in filing the petition; and (3) the accuracies or inaccuracies of the debtors' assertions in their petition and schedules. *In Re Block K Associates,* 55 B.R. 630, 633 (Bankr.D. Colo.1985). In the instant case, the Debtors' strike out on all three points. Petitions filed on the eve of the fore-

closure with the intent to cause hardship or delay to creditors and merely for the purpose of invoking the automatic stay without an intent or ability to properly reorganize is one abuse of the Bankruptcy Code and renders the petition subject to dismissal. *In Re Black,* supra; *In Re 2218 Bluebird Limited Partnership,* supra; *In Re Thirtieth Place,* supra; *In Re Thomas,* 36 B.R. 851 (Bankr.W.D.Ky. 1984); *In Re Kerzman,* 63 B.R. 393 (Bankr.D.N.D.1986). Faced with imminent foreclosure sale, the Debtors should have diligently filed their schedules and a proposed Plan so as to indicate their good faith. Rather, they simply seek more delay in this case after having forestalled FLB's right for over four years. As the record clearly establishes, the sole purpose behind the filing of the Chapter 12 petition was to frustrate and delay the efforts of FLB from enforcing their rights to which the Debtors had previously stipulated FLB could pursue."

■ I find similar circumstances present in the case *sub judice* as I found in *Turner,* supra. On the eve of sale, after extensive notice to prospective buyers, the Debtors negotiated a 30 day delay of sale only to file a Chapter 11 petition on the very day of that agreement. And for what purpose? The Debtor acknowledges the only purpose and intent of the Chapter 11 petition is to file a Plan which calls for liquidation or sale of its sole asset—a minority interest in the Libby Bank. Yet the real goal of the Debtors can be found in their own testimony, where they claim the stock is worth $60.00 per share, and it is that goal they seek to achieve. Yet they have been unable to dispose of such stock at that value eight to ten months before the date of the petition, and even they, contrary to their hopes and visions, introduced credible evidence that the very top dollar paid for the stock in the recent past is its book value of $44.00 per share for very small blocks of stock. The bankruptcy petition was filed on the eve of sale of the stock to Kootenai Bancorp, Inc., the majority owner of the Libby Bank, at a respectable price of $37.78 per share, which was submitted by

the only purchaser who could realistically be interested in such a large block of a minority interest. To this date, the Debtor, who has the exclusive right to file a Plan within 120 days of the petition, 11 U.S.C. § 1121(b), has not filed a Plan, evidently awaiting the expiration of the full statutory grace period. More important, it seems highly improbable—and certainly the Debtor has produced no evidence to the contrary—that the minority stock interest held by the Debtor will generate a buyer other than Kootenai Bancorp, Inc., at a price greater than $37.78 per share. As a practical matter, only one real purchaser of the stock is available, and the record shows that the Debtors recognize such fact because they attempted in the summer of 1987 to come to terms with Kootenai on sale, but were unable to do so. Moreover, if the Debtors are really sincere in their position that the stock can be sold for more than presently offered, their present financial statements show they have the assets personally to pay the debt due First Bank and hold the stock for as long as they wish until their price is met. Therefore, it does not require a Chapter 11 reorganization case to accomplish that result.

As stated in *In re Mildevco*, 40 B.R. 191, 193 (Bankr.S.D.Fla.1984):

"[W]here a debtor's reorganization effort involves essentially a two-party dispute which can be resolved outside the bankruptcy court's jurisdiction, and the purpose of the filing is to frustrate a creditor's sale, it has been held that the petition was not filed in good faith."

Any claim by the Debtors that the sale of stock by the Bank was not commercially reasonable can be adjusted in state court, without the need of Chapter 11 reorganization.

I conclude, based on the totality of the circumstances, that the Chapter 11 petition of the Debtors, surrounded by a serious challenge as to the real legal nature of the entity, filed this Chapter 11 petition in bad faith, to frustrate the rights and remedies of First Bank under circumstances where the sole asset of the Debtor is a minority stock interest in a national bank and where the Debtors have no cash on hand, no cash in banks, no employees, no real property, no other tangible personal property and no prospect of meaningful rehabilitation for the benefit of their creditors.

IT IS ORDERED this Chapter 11 case is dismissed.