**In re COPY CRAFTERS QUICKPRINT, INC., Debtor.**

**Bankruptcy No. 88–00018.**

United States Bankruptcy Court,
N.D. New York.

Oct. 14, 1988.

Pelland & Shockey (David W. Pelland, of counsel), Syracuse, N.Y., for debtor.

Costello, Cooney & Fearon (Dale B. Johnson, of counsel), Syracuse, N.Y., for J. Robert White.

Kevin Purcell, Office of U.S. Trustee, Albany, N.Y.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

Four pre-confirmation matters arose within the Title 11 case of Copy Crafters Quickprint, Inc. ("Debtor"): 1) the approval of the Debtor's first amended Disclosure Statement in the face of an objection lodged by the United States Trustee ("UST"), pursuant to § 1125 of the Bankruptcy Code, 11 U.S.C.A. §§ 101–1330 (West 1979 & Supp.1988) ("Code"), 2) the Debtor's motion to approve the lease of its inventory and equipment *nunc pro tunc* from January 14, 1988, pursuant to Code § 363(b), 3) the UST's motion to dismiss or convert the Debtor's Chapter 11 case, pursuant to Code § 1112(b), and 4) the motion by J. Robert White ("White") to authorize the sale of the Debtor's assets, pursuant to Code § 1123(a)(5)(D) or Code § 363(b). Hearings on all of the motions were held over a four month period, after which the Court took them under advisement together.

### JURISDICTIONAL STATEMENT

The Court has jurisdiction of the parties and subject matter pursuant to 28 U.S.C.A. §§ 1334 and 157 (West Supp.1988). These are core proceedings, 28 U.S.C.A. § 157(b)(2)(A), (M), (N) and (O), and the following constitutes findings of fact and conclusions of law rendered in accordance with Bankruptcy Rules ("Bankr.R.") 1017, 2002, 3016, 3017, 6004, 7052, 9006, 9013 and 9014.

### FACTS

The Debtor, a closely-held corporation having as its sole equity security holder and sole officer (President) Keith F. Maloney ("Maloney"), operated a printing, copying and duplicating business in Syracuse, New York. On January 8, 1988, it filed a voluntary petition under Chapter 11 of the

Code. The Debtor's schedules recited a total debt of $110,922.75 and assets amounting to $25,877.30. Its assets consisted of $100.00 in a Norstar Bank checking account, $777.30 of accounts receivables and equipment, furniture and non-production equipment accorded a market value of $25,000.00.

The most recent inventory of the property was taken in 1985, pursuant to an agreement for the purchase of the business with White, dated December 5, 1985, which the petition described as executory. White was listed as holding the larger of the Debtor's two secured claims in the amount of $40,000.00 and secured by a "second lien on equipment, and inventory (amount disputed)" valued at $25,000.00. White filed a proof of claim on February 10, 1988 in the amount of $104,497.96.

Solvay Bank ("Bank") was listed as holding a claim for $10,000.00 and secured by a first lien on equipment, inventory and accounts receivables valued at $25,000.00. The Bank filed a proof of claim in the amount of $9,768.92 on January 19, 1988. Schedule A–1 indicated federal unemployment and withholding taxes of $17,635.42 and state withholding, unemployment insurance, sales and "corporation tax (12/31/86)" of $16,419.76, for a total of $34,055.18. None of the listed taxes were identified as pre or post-petition. Thirty-nine unsecured claims amounted to $26,867.57.

The Debtor terminated its business operations January 19, 1988.

The Debtor filed a Disclosure Statement and Plan on February 29, 1988. Containing a disclaimer, it reported that the business was purchased as a going concern from its former operator one and a half years ago at a price "far in excess of revenues which the business could generate over and above normal operation expenses." *Disclosure Statement*, 3 (Feb. 25, 1988). It also stated that substantially less ("twenty percent of value as estimated in its Schedules") would be realized

through either a forced sale in the Chapter 11 or through a Chapter 7 than through the plan. *Id.* Noting the lack of unencumbered assets, the Debtor also acknowledged substantial tax claims asserted by both the Internal Revenue Service and the New York State Department of Taxation & Finance. The Debtor disclosed a prepetition purchase agreement and a post-petition lease agreement "with the proposed purchaser for the continued operation of the business pending the approval or rejection of the Debtor's Disclosure Statement and Plan of Reorganization." *Id; see also id.* at Exhibits C & D (copies of both documents).

The purchase agreement, dated December 18, 1987, was made with Richard Kuhn ("Kuhn") and signed by Maloney alone. *See id.* at Exh. D. In pertinent part, this agreement sets out a purchase price of $35,000.00, from which payment in full of the monies owed to the Bank and the federal and state tax authorities would be satisfied.[1]

The lease agreement dated January 14, 1988, with the Genesee Printing & Copy, Inc., ("Genesee") is signed by Maloney and Kuhn, on behalf of the Debtor and Genesee, respectively. It set out a month-to month tenancy commencing January 18, 1988 and involved a lease of the premises and the equipment, supplies, inventory and all else utilized in the business. Genesee Printing agreed to pay for all utilities and materials used in the business, the wages and benefits of the Debtor's employees, the loan payments to the Bank, the medical insurance premiums to White and his wife and rent and insurance for the premises. Genesee also agreed to pay Maloney personally fifty percent of the business' net monthly profit with a $1,200.00 ceiling.

The Plan contemplates that the sale proceeds would be distributed to pay in full the Code § 507(a)(1) administrative expenses in Class 1, Code § 507(a)(2)–(6) [sic] federal and state tax priority claims in Class 2 and the Bank, Class 3—the "unim-

---

**1.** This is apparently the "proposed sale of assets" that White, by motion, is requesting the Court to compel the Debtor to complete. *See Motion To* *Permit Sale,* para. 7 (rec'd. and filed Aug. 24, 1988), discussed *infra.*

paired classes." *See Plan of Reorganization,* Article III (Feb. 25, 1988). "The balance of any sums remaining" would then be applied to the claim of the Class 4 creditor, White, after which the unsecured claims held by Class 5 creditors would be paid. *See id.* at Art. IV. "At present, it is not anticipated that the proceeds of sale of the Debtor's assets will provide sufficient monies for any distribution to the creditors in Class 5." *Id.* The Plan indicated the purpose of the lease was "if this matter did not close quickly, that sufficient revenues might be generated so that the claim of White would be paid and there might even be some assets available for distribution to unsecured creditors." *Id.* at Art. V.

The UST objected to the Disclosure Statement on the grounds that it should 1) describe impairment in a detailed and accurate form 2) show the amount of cash the Debtor needs for plan confirmation, 3) explain the voting requirements under Code § 1126 and advise creditors where and when their ballots must be sent, 4) give an estimated liquidation analysis, 5) include a recent balance sheet by the Debtor, 6) describe the accounting methods used and identify the person who prepared financial information, setting forth his or her credentials, 7) list the names, addresses and relationship to the Debtor or Debtor's principal of purchaser, 8) signify that Debtor sought or is seeking court approval of lease it executed with purchaser and 9) not allow Maloney to receive any net profit under lease since that is property of the estate. *Objection Of The United States Trustee To Proposed Disclosure Statement* (Apr. 14, 1988). The Court then adjourned the hearing on April 19, 1988 to May 3, 1988 upon the Debtor's representations that an amended Disclosure Statement and motion to enter into the lease would be submitted by April 28, 1988.

The Debtor filed an Amended Disclosure Statement on May 2, 1988, attaching a balance sheet dated November 30, 1987 and a liquidation balance sheet as exhibits. The Amended Statement also identified the proposed purchaser as "a former employee ... who has no financial or other relationship with the Debtor or its principal officers or shareholders." *First Amended Disclosure Statement,* 3 (Apr. 27, 1988). The Debtor stated that the plan required approximately $35,000.00 in cash within ten days of closing to pay Classes 1, 2 and 3—the "state and federal tax claims, the lien of Solvay Bank"—and to apply any balance to White and the unsecured creditors. *Id.* at 4.

The Statement made reference to six classes and identified, without differentiating, six entities who apparently comprise these classes. It provided a description of impairment and voting procedures, under Code §§ 1124(1) and 1126(c), the alternative "fair and equitable" standard that can result in confirmation over a rejecting class and that the ballots needed to be completed and sent to the Court. Additionally, the Amended Disclosure Statement attached a copy of the lease agreement where Maloney's name was replaced by the Debtor's in the clause providing for receipt of fifty percent of the net profits of the business. *See id.* at Exhibit E.

On the same date, the Debtor moved for *nunc pro tunc* court approval of the lease of its business pursuant to Code § 363(b) and effective the date of execution, January 14, 1988. The notice of motion was served on April 29, 1988 and made returnable in Syracuse May 10, 1988. The motion consisted of an affidavit by the Debtor's attorney, David W. Pelland, Esq. ("Pelland") and a copy of the lease agreement. It states that, in the face of the Bank's and White's perfected security interests on all of its assets totalling roughly twice their fair market value, federal and state tax liabilities in excess of $34,000.00 and the possible seizure of its assets and closing of the business by New York State, it filed Chapter 11 to keep the business running, maintain the value of its assets and continue payments to its creditors. *Affidavit In Support Of Motion To Lease Debtor's Inventory And Equipment,* paras. 2–4 (Apr. 28, 1988). At that time, the Debtor had located Kuhn, a former employee, as a potential buyer of the entire business. *Id.* at para. 4.

The Debtor entered into the "proposed Lease" with Genesee Printing on January

14, 1988 to conserve monies, like the payment of rent and other operating expenses which would have been an administrative expense claim, and to avoid incurring the continuing losses of operation so as to maximize creditor distribution. *Id.* at paras. 6, 7. This was a decision made by Maloney after the petition was filed and communicated to the UST and the creditors at the first meeting of creditors. *Id.* at para. 6.

The "proposed Lease and sale agreement" was submitted "to the Court and its creditors in the filing of the Plan and the Disclosure Statement." *Id.* at para. 6, 8. The Debtor anticipated that its assets and business would be sold within sixty days after the approval of the Amended Disclosure Statement and Plan and maintained that no payments had been made under the lease and any adjustments with the purchaser were to be made at the closing.

On May 2, 1988, the UST filed its notice of motion to convert the case to Chapter 7 or, in the alternative, to dismiss, returnable in Syracuse on May 10, 1988. This was accompanied by a motion to shorten the time for the notice of the motion pursuant to Bankr.R. 9006, alleging that the Debtor had sold all or nearly all of its assets outside the ordinary course of business without court approval and that "a person or persons is currently operating at the debtor's premises, and refuses to accept service of documents from the United States Trustee." *Motion to Shorten Time,* para. 2 (Apr. 29, 1988). The UST urged the Court to grant its motion because the Debtor was trying to liquidate without the required court review and the passage of time could further dissipate its assets.

The Court granted the motion to shorten the time the same day, providing that telephonic notice of the motion was made to Debtor's counsel, in addition to mailing copies to both the Debtor and its attorney of the Order shortening the time and notice of motion and the motion for conversion or dismissal by May 3, 1988. The Court also ordered the UST to serve through mail a copy of the Order shortening the time and notice of the underlying motion to all the scheduled creditors by May 3, 1988.

The UST claims that cause has been demonstrated under Code § 1112(b) to convert or dismiss the Debtor's Chapter 11 case through, *inter alia,* 1) the debtor's attempt to liquidate without the necessary judicial oversight and with no intention to rehabilitate demonstrated by the lease currently in effect between the Debtor and the alleged purchaser which has not been court approved and which provides for Maloney, its principal, to receive monies that are property of the estate and 2) the failure to file monthly operating reports as ordered by the Court and in compliance with UST guidelines since the two submitted operating reports for January and February (the latter listing "–0–" for income and expenses) show the Debtor's inability to rehabilitate and comply with UST guidelines with regard to including a Schedule of Federal, State and Local Taxes Collected. *Motion Pursuant To 11 U.S.C. Section 1112(b) To Convert Case To Chapter 7 Or To Dismiss Case* (Apr. 29, 1988).

The UST posits that the Debtor's failure to seek court approval of the lease or of the contract to sell all of its assets shows bad faith in filing and continuing the Chapter 11 case. *Memorandum Of Law In Support Of United State's Trustee's Motion Pursuant To 11 U.S.C. Section 1112(b) To Convert Case To Chapter 7 Or To Dismiss Case* (rec'd and filed May 16, 1988). It argues that this bad faith is also discernible in the Debtor's moving for court approval under Code § 363(b) 101 days after the transfer of its property to the lessee/purchaser. The UST contends that the Debtor "has attempted to abuse the bankruptcy system by structuring the case so that the intended purchaser will not be subject to an 11 U.S.C. § 363(b) review ... and to reduce itself to a non-operating shell corporation" shortly after its filing. *Id.* at 5.

The UST also charges that the Debtor's failure to file operating statements with necessary financial information required by the Court constitutes grounds to convert or dismiss its case as well as contributes to the overall presence of bad faith. *Id.* at 8. The UST urges that it would be in the best

interests of the creditors if the Debtor's Chapter 11 case were converted to a Chapter 7, rather than dismissed. *Id.* at 9. In this way, the appointed trustee could investigate whether the Debtor's cash assets were paid to its principal pursuant to the lease and thus protect unsecured creditors from any prejudice that may result from the Debtor's failure to comply with the Code's financial reporting requirements. *Id.* at 9. Additionally, the UST suggests that under dismissal, the Debtor's principal would not be compelled to pay any of the sale proceeds to the creditors. *Id.*

The Debtor characterizes the agreement made on January 14, 1988 as a lease "subject to approval of the Bankruptcy Court" and "in conjunction with a proposed sale of its business." *Affidavit In Opposition To U.S. Trustee's Motion to Dismiss or Convert*, para. 3 (May 10, 1988). It claims that it filed the § 363(b) motion as well as its Amended Disclosure Statement "solely upon the objections of the U.S. Trustee's office." *Id.* at para. 5. Furthermore, it asserts that the lease period was only anticipated to have lasted "for a few short months pending approval" of its Disclosure Statement and Plan and the lessee had agreed to pay all current operating expenses including the monthly loan payments to the Bank, rent and current taxes and wages. *Id.* at para. 7.

The Debtor takes issue with the UST's portrayal of it liquidating without Court review and points to communications it had with an attorney at the UST office and the filing of a plan and disclosure statement, "based upon the proposed sale agreement and Lease which, ... were 'subject to approval' of this Court", shortly after the petition was filed. *Id.* at para. 10. Debtor asserts that it was "expedient" to try to complete the proposed lease and sale through the Plan rather than by motion, given the type of case and monies involved. It feels that the greatest economical return on its assets can be realized through the liquidating Chapter 11 for the benefit of its creditors and possibly towards creating a heretofore extremely unlikely distribution to those holding unsecured claims. *Id.* at para. 13–14.

The Debtor maintains that it never made any effort to conceal the proposed lease or sale from the Court and "resents" the UST's implication of bad faith. *See* Letter from David W. Pelland, Esq. to the Hon. Stephen D. Gerling (May 19, 1988). It also points to White's knowledge and consent of the proposed lease and sale, as set forth in the May 11, 1988 letter to the Court by White's counsel, *see infra.* Moreover, the Debtor states that White would be paid "approximately $20,000.00 by way of a payment of $5,000.00 from Keith Maloney, the former principal of the corporation, and by way of the purchaser's continued payment for a health insurance policy covering J. Robert White and his family for a period of five years." *Id.* at p. 2.

The Debtor also asserts that the best interests of the creditors would be served in allowing the Chapter 11 proceeding to continue, including the lease, so that the liquidation value of its assets would be maximized and the Court given the opportunity to review any and all financial information pending Plan confirmation. *Id.* at 2–3. It claims that, prior to moving to dismiss or convert, the UST never commented on the Amended Disclosure Statement filed at its behest and points out that this amended document corrected an error in the original lease regarding the receipt of net proceeds by Maloney, instead of, correctly, by the Debtor.

The Debtor also suggested "that there is no other viable proceeding in Bankruptcy Court and/or the New York State Courts which would provide the Debtor or the creditors with the ability to complete this sale in an economic and expeditious fashion." *Id.* at 3. In sum, the Debtor asks the Court to dismiss its case should it not allow the continuation of the Chapter 11. *Id.* at 2.

An adjourned hearing, combining the approval of the Disclosure Statement, the Debtor's motion to approve the lease *nunc pro tunc* and the UST's motion to convert or dismiss, was conducted on May 10, 1988 in Syracuse, New York.

Subsequently, White brought on a motion, notice of which and supporting papers were served August 23, 1988 on the Debtor, its counsel and the UST and made returnable in Syracuse September 6, 1988. This motion asked for "an order permitting and directing the debtor to complete the proposed sale of the assets, whether under Section 1123(a)(5)(D) or under Section 363, provided that the liens and encumbrances against the property to be sold attach to the proceeds to the extent and with all validity to which they were entitled with respect to the original collateral." *Motion to Permit Sale, supra,* at 7. *See also* Letter from Dale B. Johnson, Esq. to the Hon. Stephen D. Gerling (May 11, 1988) (White's counsel informally expressing the same concerns).

White represented that the Debtor's payments to the senior lienholder had stopped and that he held the second priority security interest in virtually all of the Debtor's business assets. *See id.* He also asserted Kuhn's willingness to conclude the sale but that it was contingent on the continued and uncertain availability of his bank's lending commitment. *See id.* White argued that the Debtor or the estate would not be adversely affected by the completion of the sale since an asset sale was inevitable whether or not the Debtor's case was converted to Chapter 7. *See id.* A hearing was held in Syracuse on September 6, 1988.

## DISCUSSION AND CONCLUSIONS OF LAW

The Court will consider each motion in the order in which it was made.

### I. *Approval of Disclosure Statement*

The Court cannot confirm a Chapter 11 plan unless the twelve requirements in Code § 1129(a) are met. *See In re Future Energy Corp.,* 83 B.R. 470, 481 (Bankr.S.D. Ohio 1988). Absent a "cram-down" scenario under Code § 1129(b), Code § 1129(a)(8) provides that each impaired class of claims must accept the plan in accordance with Code § 1126. The solicitation of acceptances or rejections can only be made after a court-approved written disclosure state-ment is sent to each holder of a claim or interest, accompanied by the plan or a summary of the plan. Code § 1125(b).

The disclosure statement must contain "adequate information" as is "reasonably practicable" given the debtor's circumstances to "enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." Code § 1125(a). What constitutes adequate information is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess., 224, 408–409 ("House Report"), *reprinted in* 1978 U.S. Code Cong. & Admin.News, pp. 5787, 5963, 6183–6184, 6365, *quoted in Kirk v. Texaco, Inc.,* 82 B.R. 678, 682 (S.D.N.Y.1988), *In re Monnier Bros.,* 755 F.2d 1336, 1342 (8th Cir.1985) *and First American Bank of New York v. Century Glove Inc.,* 81 B.R. 274, 278 (D.Del.1988). *See also In re Texas Extrusion Corp.,* 844 F.2d 1142, 1157 (5th Cir.1988); *In re Monroe Well Service, Inc.,* 80 B.R. 324, 330–331 (Bankr.E.D.Pa. 1987). Moreover, in ascertaining the adequacy of information in a disclosure statement, the bankruptcy court must consider each creditor's access to outside sources of information. *See First American Bank of New York v. Century Glove, Inc., supra,* 81 B.R. at 278–279 (analyzing Code § 1125(a)(2)(C)).

"Section 1125, then, effects what Congress believed to be the best compromise between insuring the meaningful disclosure of financial information necessary to evaluate a plan of reorganization and allowing parties to that bankruptcy proceeding the greatest possible freedom in developing such a plan of reorganization." *Public Service Co. Of New Hampshire v. Consolidated Utilities And Communications, Inc.,* 846 F.2d 803, 808 (1st Cir.1988). In this light, Code § 1125's standard of "reasonable practicability" suggests that mistakes or internal inconsistencies in a disclosure statement do not necessarily preclude

approval. *See Kirk v. Texaco, Inc., supra,* 82 B.R. at 683 (citing to *In re The Stanley Hotel,* 13 B.R. 926, 930 (Bankr.D.Colo. 1981)). "[T]he length of a document should not be the test of its effectiveness" since complex and numerous additions to a disclosure statement may be self-defeating in regard to the average investor's overall understanding. *See In re Waterville Timeshare Group,* 67 B.R. 412, 414 (Bankr.D.N.H.1986) (quoting *In re The Stanley Hotel, supra,* 13 B.R. at 933–934). *See also In re Scioto Valley Mortgage Co.,* 88 B.R. 168, 171 (Bankr.S.D.Ohio 1988).

■ A disclosure statement is to aid the creditors in evaluating the plan on its face so its approval is not intended to be the primary focus of litigation in a contested Chapter 11 proceeding. *See Waterville Timeshare Group, supra,* 67 B.R. at 413 (citations omitted). Thus, approval should be withheld if 1) it is apparent that the plan will not comply with Code § 1129(a) and 2) if it does not contain such information so that all creditors and equity shareholders can make an intelligent and informed decision as to whether to accept or reject the plan. *See In re Unichem Corp.,* 72 B.R. 95, 97 (Bankr.N.D.Ill.1987); *In re Pecht,* 53 B.R. 768, 772 (Bankr.E.D.Va.1985); *In re McCall,* 44 B.R. 242, 243 (Bankr.E.D.Pa. 1984). "Submitting the debtor to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would delay any possibility of a successful reorganization." *In re Pecht, supra,* 53 B.R. at 768–769.

However, care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting and where the pertinent material facts are either not at issue or have been fully developed at the disclosure statement hearing. *See In re Monroe Well Service, Inc., supra,* 80 B.R. at 333. *See, e.g., In re*

*Civitella,* 15 B.R. 206 (Bankr.E.D.Pa.1981) (approval denied where allegations in disclosure statement that plan superior to forced sale unsupported by factual information so that voting parties were unable to independently evaluate merits of plan).

■ Generally speaking, the Chapter 11's size and complexity, the kind of plan proposed and the kind of claims or interests it impairs and the access by these impaired holders to relevant information from other sources serve as a starting point in the evaluation of the adequacy of disclosure. *See In re Monroe Well Service, Inc., supra,* 80 B.R. at 330. In its objection to the Debtor's disclosure statement, the UST has enumerated some of the various factors courts have considered in making the determination. *See, e.g., In re Scioto Valley Mortgage Co., supra,* 88 B.R. at 170–171 (setting forth nineteen criteria and citing cases). Accordingly, the Court will now turn to the adequacy of disclosure in the Debtor's First Amended Disclosure Statement as measured against the backdrop of the foregoing.[2]

■ At the start, the Court notes that this is a "liquidating" Chapter 11 of comparably small size and complexity, with assets of approximately $26,000.00 and debts of at least $110,000.00. The Court is somewhat skeptical of the value given to the assets based upon an inventory taken three years ago. In order to determine which claims the proposed plan impairs, it is necessary to know the size and status of each claim and the amount of monies to be distributed. Thus, the two crucial questions that need to be answered in the Debtor's Disclosure Statement are what is the priority among the forty-three creditors and what monies will be generated by each type of possible sale, e.g. forced, through the plan, outside the ordinary course of business pre-confirmation or piecemeal.

The Disclosure Statement has indicated a $35,000.00 purchase price for a sale that

---

**2.** The Court notes that the UST's objection appears to be directed towards the Debtor's first Disclosure Statement, filed on February 29, 1988, rather than the First Amended Disclosure Statement, filed on May 2, 1988. This does not change the focus of the instant memorandum-decision on the more recent of the two documents.

will allegedly be part of the proposed Plan, although the attached "agreement" is unsigned by the purported purchaser, putting at issue its enforceability assuming Kuhn is still interested. The Disclosure Statement also notes that the monies realized "if sold at liquidation" would be nominal, perhaps twenty percent of their fair market value of some $25,000.00. However, the attached liquidation analysis at Exhibit B does nothing more than calculate twenty percent of the alleged 1985 value of the inventory and equipment and the accounts receivable. Absent a more recent valuation of the property by a qualified individual and an assessment of the collectibility of the accounts receivable, the Court is reluctant to approve a Disclosure Statement premised on an unsupported and self-serving valuation and a speculative sale. *See In re Scioto Valley Mortgage Co., supra,* 88 B.R. at 170; *see, e.g., In re Civitella, supra,* 15 B.R. at 206. This is before even considering whether the Plan complies on its face with Code § 1129(a). *See In re Pecht, supra,* 53 B.R. at 772.

The Disclosure Statement speaks of six classes and identifies six entities but fails to designate which creditors belong in which class in its summary of the plan. *See First Amended Disclosure Statement, supra,* pp. 4–5. However, the Plan classifies the claims into five classes. This is more than an internal inconsistency for it obscures which claims are in Classes 1, 2 and 3 and will be paid in full within ten days of closing. *Id.* at 4. In addition, the vague reference in the Disclosure Statement to the claims of administration is never explained, although one knowledgeable in bankruptcy law might deduce from looking at the Plan that the administrative expenses comprise Class 1, and that, indeed, the federal and state tax claims, formerly placed into Class 2, are now divided into Classes 2 and 3 in the First Amended Disclosure Statement.

But these kind of speculative gyrations from document to document do not amount to adequate information within the Disclosure Statement and are the very evil Code § 1125 was enacted to deter. The burden of deciphering the meaning of the treatment of a claim should not be placed upon a creditor inexperienced with the technicalities of bankruptcy law at this early stage of a bankruptcy proceeding. Furthermore, an estimate of all the administrative expenses, including attorneys' and accountants' fees, is vital since it will obviously decrease the distribution to other priority creditors, assuming there are monies remaining after the payment of secured claims. *See In re Scioto Valley Mortgage Co., supra,* 88 B.R. at 170.

It is clear that the creditors holding general unsecured claims will see nothing out of this Plan and, so, are "impaired", as acknowledged in Article IV of the Plan. *See* Code § 1124; *In re Barrington Oaks General Partnership,* 15 B.R. 952 (Bankr. D.Utah 1981). The petition discloses that all but four of these thirty-nine creditors—an insurance company, accountant, law firm and a supply company—hold claims under $1000.00 and appear to be small businesses.[3] It is fair to assume that all but the professionals fall within the category of the "average investor", rather than that of the "sophisticated investor", and that their access to supplemental financial information is probably limited to newspapers.

Thus, it is important for these average investors/general unsecured creditors that the Disclosure Statement contain simple and clear language delineating the consequences of the proposed plan on their claims and the possible Code alternatives so that they can intelligently accept or reject the Plan. The Court finds that the First Amended Disclosure Statement does not contain the kind of clarity nor realism required by the adequate information standard of Code § 1125 with regard to this impaired class of unsecured creditors. Rather, it paints a positive and misleading picture unsupported by the Debtor's financial condition, the record or the Code.

**3.** The Court notes that the November 30, 1987 balance sheet bears the name of the same accountant but his credentials are not revealed in the body of the Disclosure Statement. *See First Amended Disclosure Statement, supra,* exhibit C.

The Court also notes that White filed a proof of claim more than four times the amount listed in the Debtor's petition and more than two and one-half times the amount listed in the liquidation analysis. *See First Amended Disclosure Statement, supra*, Exhibit B. Nowhere is there any mention of potential litigation to determine the amount of said claim which is quite likely given the active participation of his counsel in this case from the start.

Additionally, the same Exhibit B contains a note—"[i]f Debtor's Plan is approved, the Solvay Bank and Federal and State Taxes will be paid and any remaining balance from sale of assets would go to Robert J. White and then to unsecured creditors." *Id.* The distribution of any sale proceeds is determined by the post or pre-petition nature of the tax claims, whether any pre-petition tax claims are secured by liens, and whether or not the sale of the business would be subject to the existing valid security interests of the Bank and White. These facts cannot be gleaned from the First Amended Disclosure Statement. Thus, it is impossible to ascertain whether the claims of the tax authorities and the Bank are impaired, as is White's (which the proposed plan has indicated) and whether their acceptances will be necessary pursuant to Code § 1129(a)(8). This is the "adequate information" that the entire creditor body has a right to know so that they can make informed choices with regard to voting.

Finally, the Court observes that the "corrected" proposed lease, contained in the instant Disclosure Statement as Exhibit E, replaced the Debtor as the recipient of half of the business' monthly net profits instead of the Debtor's principal, Maloney. This material alteration is unaccompanied by any sworn affidavit and is explained away in the Debtor's letter memorandum response to the UST's motion to convert or dismiss as "an error". *See* Letter from David W. Pelland to the Hon. Stephen D. Gerling, *supra*, at 3. As such, it is highly suspect, especially in light of the lack of disclosure with regard to Maloney's pre and post-petition compensation.

On these grounds, approval of the Debtor's First Amended Disclosure Statement cannot be granted.

## II. *Debtor's Motion to Approve Post-Petition Lease Nunc Pro Tunc*

The test in this Circuit for approving a transaction under Code § 363(b) is that "there must be some articulated business justification, other than appeasement of major creditors." *See Comm. Of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d.Cir.1983). *See also Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389–390 (6th Cir.1986); *Institutional Creditors Of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir.1986); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 17, 19–20 (9th Cir. BAP 1988); *In re Industrial Valley Refrigeration And Air Conditioning Supplies*, 77 B.R. 15, 21 (Bankr.E.D.Pa.1987). *But see In re White Motor Credit Corp.*, 14 B.R. 584 (Bankr.N.D.Ohio 1981) (sale of major part of estate may be permitted only in an emergency).

The disposition of an estate's assets pursuant to Code § 363(b) prior to a plan, whether through sale, lease or other use, can collide with Chapter 11 and the two must be harmonized since they are not mutually exclusive. *See In re Lionel Corp., supra*, 722 F.2d at 1071. Code § 363 does not "authorize a debtor and the bankruptcy court 'to short circuit the requirements of a reorganization plan by establishing the terms of the plan *sub rosa* in connection' with a proposed transaction." *In re Continental Air Lines, Inc., supra*, 780 F.2d at 1226 (quoting *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir.1983)). *See also In re Brookfield Clothes, Inc.*, 31 B.R. 978, 983 (S.D.N.Y. 1983); *American Savings and Loan Ass'n v. Sedona San Carlos Development Co. (In re Sedona San Carlos Development Co.)*, 59 B.R. 113, 115 (Bankr. D.Ariz.1986) (debtor cannot sell property free and clear of lien pursuant to Code § 363(b)(1) and "cramdown" undersecured

creditor without plan of reorganization). However, it can provide an expeditious avenue for the transfer of property in exchange for a reasonable consideration if in the best interests of the estate and the prospects of confirming a plan to serve as the vehicle to do so appear dim or far in the future. *See generally* Hurley, *Chapter 11 Alternative: Section 363 Sale of all of the Debtor's Assets Outside a Plan of Reorganization*, 58 AM.BANKR.L.J. 233 (1984).

Moreover, in a Chapter 11 where the Debtors sought to sell all the operating assets pre-confirmation and eventually file a liquidating plan, the court stated that "appropriate notice should be a functional substitute for the adequate information which would be contained in a disclosure statement concerning the proposed transaction." *In re Naron & Wagner, Chartered*, 88 B.R. 85, 88, 18 B.C.D. 18, 20 (Bankr.D. Md.1988). Likewise, Bankruptcy Judge David A. Scholl has held that the approval of a pre-confirmation sale pursuant to Code § 363(b)(1) must be based on 1) a good business purpose, 2) accurate and reasonable notice, 3) an adequate price and 4) the presence of good faith, i.e. the absence of any lucrative deals with insiders. *See In re Industrial Valley Refrig. & Air Cond. Supp., supra*, 77 B.R. at 21.

Thus, the importance of notice cannot be underscored for it is the due process component of a § 363(b) transfer in that it gives all parties in interest an opportunity to be heard. *Cf. Owens–Corning Fiberglass Corp., v. Center Wholesale, Inc. (In re Center Wholesale, Inc.)*, 759 F.2d 1440, 1448–1449 (9th Cir.1985) (cash collateral order void where notice of hearing violated due process). Notice then of a pre-confirmation transaction under Code § 363(b) serves as a substitute for the safeguards of disclosure, voting, acceptance and confirmation were it instead part of a Chapter 11 plan. If properly given and there is no objection to the proposed use, sale or lease of property and any liens remain unaffected, there is no need for a hearing. B. Weintraub & A. Resnick, BANKRUPTCY LAW MANUAL ¶ 8.11[3][b] at 8–32 (rev. ed. 1986) (citing to Code § 102(1)).

Sensitive to the tension between "363" transfers and Chapter 11 plans and aware of the potential for abuse, the *Lionel* court instructed the bankruptcy judge

to consider all salient factors pertaining to the proceeding ... [such as] the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*In re Lionel Corp., supra*, 722 F.2d at 1071.

The approval of a transaction under Code § 363(b) prior to the confirmation of a Chapter 11 plan has been granted for "good business reasons" such as if the agreement would increase cash flow and profits and exploit a competitive advantage, *see In re Continental Air Lines, Inc., supra*, 780 F.2d at 1227 (lease proposal) and if the trustee could not operate the business at a profit and operations were about to cease because the business could not meet its expenses, *see Stephen's Ind., Inc. v. McClung, supra*, 789 F.2d at 390 (sale).

The Court notes that while the instant motion seeks approval for the lease of the Debtor's business, it is packaged as part of a sale which is the centerpiece of the proposed Plan. Furthermore, the contemplated purchaser is the lessee's principal and a former employee of the Debtor. The approval of this lease will effectively put the Court's imprimatur on the sale and confirm the Plan long before the hurdles of Chapter 11 are overcome. In encompassing the sole asset of the Debtor, this proposed lease "boot-straps" the sale and "short-circuits" the Chapter 11.

It has been ten months since the Debtor filed its Chapter 11 case. Six days after doing so it entered into the lease involving

all of its assets which terminated operations five days later—ten days post-petition. Almost four months after the Debtor entered into this lease it filed the instant motion for court approval. It is inconceivable to the Court that at the time of filing the Debtor had no plans of executing the lease. This is especially so given the relative swiftness with which it filed its Disclosure Statement and plan, some seven weeks after filing the petition, bespeaking of an orchestrated case.

The Debtor gave no explanation for this long overdue motion regarding a lease it was already operating under other than that it was at the UST's insistence, maintaining instead that the lease was "subject to approval" and part of the Plan which had yet to be confirmed. But the UST's reading of Code § 363's requirement for "notice and a hearing" where a transfer of property outside the ordinary course of business is sought, as here, does not differ from the Court's. While appreciating a lawyer's "strategizing" to further the interests of his client, the Court will not sanction such "knee-jerk" maneuvers, revealing as it does a "slam-dunk" approach with regard to the confirmation of plans.

Additionally, the original lease provided that its principal, Maloney, an insider, would receive certain monies that were clearly property of the estate, although this was conveniently labeled an error and changed in a subsequent version. *See First Amended Disclosure Statement, supra,* Exhibit E. This does not impart good faith, *see infra.* Finally, the essential procedural safeguard for the creditors in the applicable notice provision, *see* Bankr.R. 2002(a)(2), was not complied with—the Debtor only gave eleven days of notice instead of the required twenty. This last factor is especially troubling given the absence of a court-approved and disseminated disclosure statement, *see supra.* "The need for expedition, ... is not a justification for abandoning proper standards." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 450, 88 S.Ct. 1157, 1176, 20 L.Ed.2d 1 (1968).

It may be true that the business was rapidly losing money and a lease prevented those operating losses from draining the estate. It may also be true that the assets in question are probably decreasing in value, assuming their worth in 1988 approximated their 1985 worth, and that the lease to Genesee formed an integral part of a sale with a good purchase price. However, the Debtor offered no proof on these facts and simply had no authority to unilaterally decide to enter into a lease without first seeking court approval. Its staunch characterization of the lease as "proposed" and subject to the court's approval throughout these proceedings is not persuasive. The Debtor has not met his burden and certainly fails to warrant *nunc pro tunc* relief.

While a presumption of reasonableness attaches to a debtor's management decisions with regard to transactions within the ordinary course of business, those extraordinary transactions are required to be brought to the attention of all parties-in-interest to allow them to articulate any objections to the debtor's proposals. *See Comm. of Asbestos–Related Litigants And/Or Creditors v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 60 B.R. 612, 615–616 (Bankr.S.D.N.Y.1986). *See also Bankwest v. Moore (In re R & B Samons, Inc.),* 75 B.R. 145, 147 (Bankr.D. S.D.1987); *cf. Sapir v. Coppinger Color Lab, Inc. (In re Photo Promotion Associates, Inc.),* 72 B.R. 606, 610–612 (Bankr.S. D.N.Y.1987); *In re Roxy Roller Rink Joint Venture,* 73 B.R. 521, 527–528 (Bankr.S.D.N.Y.1987); *In re J.L. Graphics, Inc.,* 62 B.R. 750, 754–756 (Bankr.D.N.H. 1986), *aff'd. sub. nom. In re Cross Baking, Inc.,* 818 F.2d 1027 (1st Cir.1987). "A court may approve adequate protection *nunc pro tunc* if it finds that approval would have been granted if proper procedures had been followed." *In re Blehm Land And Cattle Co.,* 71 B.R. 818, 824 (D.Colo.1987). If proper procedures had been followed in the case at bar, the Court is not convinced that it would have approved the lease in question.

The granting of *nunc pro tunc* relief here would render the due process safeguard of Code § 363(b)(1) a casualty. The

Code does not provide the benefits of its "breathing spell" to a debtor without imposing some burdens. A debtor cannot seek relief under the Code and then attempt to circumvent its requirements to the detriment of its creditors. This is an abuse the Court will not countenance and equity cannot support.

Accordingly, the Debtor's motion to approve the lease *nunc pro tunc* is denied.

### III. *UST's Motion to Dismiss or Convert*

■ The lack of good faith in filing and continuing a Chapter 11 constitutes "cause" within the meaning of Code § 1112(b). *See Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.)*, 779 F.2d 1068, 1071–1073 (5th Cir.1986); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir.1985); *Albany Partners, Ltd. v. W.P. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984); *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.T., Inc.)*, 709 F.2d 762, 764 (1st Cir.1983); *In re Mandalay Shores Cooperative Housing Ass'n., Inc.*, 63 B.R. 842, 846–849 (N.D.Ill.1986); *In re Route 202 Corp.*, 37 B.R. 367 (Bankr.E.D. Pa.1984); *In re Northwest Recreational Activities, Inc.*, 4 B.R. 36, 39 (Bankr.N.D. Ga.1980); 5 L. King, COLLIER ON BANKRUPTCY ¶ 1112.03 at 1112–26 & n. 50 (15th ed. 1988). The initial burden of proof for conversion or dismissal lies with the moving party. *See In re Santiago Vela*, 87 B.R. 229, 231 (Bankr.D.Puerto Rico 1988). Once the debtor's good faith has been put into question, the debtor bears the burden of proving good faith. *See In re Scheffler*, 86 B.R. 576, 578 (Bankr.W.D. Wis.1986) (quoting *In re Setzer*, 47 B.R. 340 (Bankr.E.D.N.Y.1985)).

■ It is within the Court's broad discretion to convert or dismiss the case, provided the best interests of the creditors and the estate are served. *See* Code § 1112(b); *In re Albany Partners, Ltd., supra*, 749 F.2d at 674; *In re Justus Hospitality Properties, Ltd.*, 86 B.R. 261, 265 (Bankr. M.D.Fla.1988); *In re Eden Associates*, 13 B.R. 578, 583–584 (Bankr.S.D.N.Y.1981).

*See also* House Report at 405–406, *reprinted in* 1978 U.S.Code Cong. & Admin.News. at 6361–6362. However, the harshness of dismissal mandates that it result only upon a strong evidentiary showing and after a consideration of the merits of the debtor's plan. *See* COLLIER ON BANKRUPTCY, *supra*, at 1112–28; *see also In re Brauer*, 80 B.R. 903, 911 (N.D.Ill.1987).

"In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions." *In re Albany Partners, Ltd., supra*, 749 F.2d at 674, *quoted in Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.)*, 825 F.2d 296, 298 (11th Cir.1987). *See also In re Eden Associates, supra*, 13 B.R. at 584 (stressing inquiry on intent to abuse judicial process rather than the delay to creditors). "[A] debtor must be open, honest and straightforward in any proceedings dealing with the administration of the estate, and failure of that conduct should pique the Court's interest as to whether the bankruptcy process is being abused." *In re Bennett, Remick & Bennett*, 84 B.R. 182, 185 (Bankr.D.Mont.1988).

■ A determination with regard to "good faith" necessitates an examination of all the facts and circumstances in the case. *See In re Little Creek Development Co., supra*, 779 F.2d at 1072; *In re Scheffler, supra*, 86 B.R. at 578–579; COLLIER ON BANKRUPTCY, *supra*, at 1112–28. Absent other factors, the sale of a debtor's sole asset, standing alone, does not establish the lack of good faith. *See Del Rio Development, Inc. v. First Liberty Financial, Inc. (In re Del Rio Development, Inc.)*, 35 B.R. 127 (9th Cir. BAP 1983).

■ While the primary purpose of Chapter 11 is reorganization, liquidation is not prohibited. *See* Code §§ 1123(a)(5)(D), 1123(b)(4); 1129(a)(11). "Reorganization encompasses rehabilitation and may include liquidation. Rehabilitation, on the other hand, may not include liquidation." *In re The Ledges Apartments*, 58 B.R. 84, 87

(Bankr.D.Vt.1986). In certain instances, a Chapter 11 liquidating plan is preferable to a Chapter 7 proceeding because the disposition of assets will be conducted in a less expensive, swifter and more orderly manner by a debtor-in-possession, as opposed to a trustee, who, while disinterested, is still a third party unfamiliar with the property of the estate. *See In re Naron & Wagner, Chartered,* 88 B.R. at 88, 18 B.C.D. at 20 (Bankr.D.Md.1988); *In re Jartran, Inc.,* 71 B.R. 938, 942, n. 6 (Bankr.N.D.Ill.1987); *In re Searles Castle Enterprises, Inc.,* 17 B.R. 440, 442 (Bankr. 1st Cir.1982); *In re L.N. Scott Co., Inc.,* 13 B.R. 387 (Bankr.E. D.Pa.1981); B. Weintraub & A.Resnick, BANKRUPTCY LAW MANUAL ¶ 817 at 8–29, 8–81 (rev.ed. 1986).

Thus, if the Debtor's filing is based on its economic realities and consistent with a legitimate reorganization purpose, liquidation under Chapter 11 is valid. *See In re Clinton Centrifuge, Inc.,* 72 B.R. 900, 905–906 (Bankr.E.D.Pa.1987); *In re Corey,* 46 B.R. 31 (Bankr.D.Hawaii 1984).

■ Based upon a scrutiny of the totality of the circumstances surrounding the Debtor's Chapter 11 case, *see supra* I and II, and the Debtor's failure to meet its burden with respect to the lack of good faith as raised by the UST, the Court finds conversion to Chapter 7 to be in the best interests of the creditors and the estate, especially given the questionable provisions of the "proposed" lease as it originally stood. The appointed trustee can then determine if a transfer of the assets under Code § 363(b) is appropriate, *see, e.g., In re Robison,* 74 B.R. 646 (E.D.Mo.1987), ensure the scrupulous liquidation of the property of the estate and prevent prejudice to the unsecured creditors stemming from the Debtor's failure to supply crucial financial information.

This result is buttressed by the absence of any monthly operating reports after the first two were filed in January and February. *See* Bankr.R. X–1007(b); *In re Mandalay Shores Cooperative Housing Ass'n, Inc., supra,* 63 B.R. at 848 (debtor's failure to cooperate with court may constitute cause under Code § 1112(b)); *In re Scheffler, supra,* 86 B.R. at 579; *In re Cohoes Industrial Terminals, Inc.,* 65 B.R. 918, 923 (Bankr.S.D.N.Y.1986). Moreover, the lack of a recent asset appraisal and the Debtor's non-operating status renders its claim that a Chapter 11 liquidation will generate more monies than one under Chapter 7 speculative, at best.

### IV. *White's Motion To Compel The Sale*

For the reasons previously discussed, *see supra* at II, the Court denies this motion. This is so notwithstanding White's questionable standing to make such a motion, its defective notice, *see, e.g.,* Bankr.R. 2002(a)(2), and the fact that it appears as if the relief sought is a mandatory injunction which must be instituted by complaint, not motion. *See* Bankr.R. 7001(7).

Accordingly, it is hereby

ORDERED:

1. That approval of the Amended Disclosure Statement is denied due to its failure to comply with Code § 1125.

2. That the Debtor's motion to approve the lease execution *nunc pro tunc* pursuant to Code § 363(b) is denied.

3. That the UST's motion to dismiss or convert pursuant to Code § 1112(b) is denied as to dismissal and granted as to the conversion to Chapter 7.

4. That White's motion to compel the Debtor to complete the sale is denied, under Code § 363(b) or Code § 1123(a)(5)(D).