**In re GARSAL REALTY, INC., Debtor.**

**Bankruptcy No. 88–01562.**

United States Bankruptcy Court,
N.D. New York.

Feb. 17, 1989.

---

Harter, Secrest & Emery, Rochester, N.Y., for debtor (Larry Scheafer, of counsel).

Green & Seifter, P.C., Syracuse, N.Y., for Federal Home Loan Mortg. Corp. (Robert K. Weiler and Virginia A. Hoveman, of counsel).

Richard Croak, Office of U.S. Trustee, Albany, N.Y.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

This contested matter comes before the Court on the motion of the Federal Home Loan Mortgage Corporation ("Freddie Mac") to modify the automatic stay imposed by § 362 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (West 1979 & Supp. 1989) ("Code"), permitting Freddie Mac to continue a previously commenced mortgage foreclosure proceeding in state court against Garsal Realty, Inc. d/b/a Yorkshire Manor ("Debtor"). Alternatively, the motion seeks the dismissal of the Debtor's bankruptcy case pursuant to Code § 1112(b) or, at the very least, the continuation of a state court receivership during the pendency of the motion under Code § 543.

An evidentiary hearing was held on December 5, 1988 and continued on December 9, 1988. The Court then allowed both parties to submit memoranda of law and the matter was finally submitted for decision on January 4, 1989.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction of the parties and the subject matter pursuant to 28 U.S. C.A. §§ 1334 and 157 (West Supp.1988). This is a core proceeding, 28 U.S.C.A. § 157(b)(1), (b)(2)(A), (G), (M) and (O), and the following constitutes findings of fact and conclusions of law rendered in accordance with Bankruptcy Rules ("Bankr.R.") 1017, 3012, 4001, 7052, 9014 and 9017.

## FACTS

On October 13, 1988, the Debtor, filed a voluntary petition pursuant to Chapter 11 of the Code. In the schedules A–1 through A–3 filed with the petition, the Debtor indicated priority claims totalling $4,797.46, one secured claim of $1,382,388.51, and unsecured debt of $383,902.58. *Freddie Mac Exhibit R15.* The unsecured debt listed amounts owed to nine trade creditors and personal loans for capital improvements made by Sally Gross ("Gross") "between 1971 to present" and from Karen Rosenthal ("Rosenthal") "from March, 1978 to March, 1979" in the sums of $280,000.00 and $100,000.00, respectively. Gross and Rosenthal, along with one Gary Davis and Dr. Daniel Elstein, were listed as equity security holders. *Id.*

In Schedule B–1, Debtor claimed ownership of a sixty unit apartment complex on 4.6 acres of real property known as "Yorkshire Manor, 5001 Milton Avenue, Camillus, N.Y." ("Yorkshire Manor") with a value based upon a July 1985 appraisal of $1,560,000.00. *Id.* Additionally, the Debtor scheduled miscellaneous appliances, equipment and supplies having a value of $39,710.00, as its only remaining assets. *Id.*

The Debtor acknowledged that its singular secured debt was owed to the Federal Home Mortgage Corporation [sic] in the amount of $1,382,388.51. The debt was not listed as disputed, contingent or unliquidated. *Id.*

The Statement of Affairs filed by the Debtor with its Petition recited that its business was that of real estate management. The Statement further indicated that the Debtor had previously filed a Chapter 11 case in this Court under the

index · number BK–81–00173, and that at the time of the current filing, a mortgage foreclosure action commenced by Freddie Mac was pending in Supreme Court, Onondaga County, State of New York. Finally, the Statement indicated that a receiver has been appointed in that foreclosure proceeding. *Id.*

The 1981 Chapter 11 case referred to in the Debtor's Statement of Affairs had culminated in an Order Confirming Plan as Amended ("Confirmation Order") entered on January 19, 1983. *Freddie Mac Exhibit R1.* That Confirmation Order approved a Plan, as amended ("Confirmed Plan"), which among other things, provided for the entry of a judgment of foreclosure and sale in a pre-petition suit of the first mortgage lien against the same Yorkshire Manor held by the Troy Savings Bank ("Troy"). *Freddie Mac Exhibit R2.* Several other pre-petition foreclosure actions had been commenced against Yorkshire Manor, and at the time of the first Chapter 11 filing, a state court receiver had been appointed in the then-pending foreclosure action. The Confirmed Plan contained numerous provisions favoring Troy in the event of Debtor's default thereunder. *Id.* The Confirmed Plan also terminated the state court receivership and returned management of Yorkshire Manor to the Debtor. *Id.*

The Confirmed Plan contained a provision for the continued jurisdiction of this Court with the exception that Troy would have the right to conduct a foreclosure sale in the event of Debtor's default under the Plan, without resort to the Court. *Id.* It further provided that no party would have the right to seek an order from any court staying the foreclosure sale. *Id.*

On November 4, 1985, Troy assigned its mortgage of $544,159.44, consisting of five distinct mortgages, to the SBU Realty Credit Corporation ("SBU"). *Freddie Mac Exhibit R5.* On November 6, 1985, the Debtor executed and delivered a Multi-Family Note and Mortgage ("MFM") to SBU in the sum of $555,840.56. *Freddie*

*Mac Exhibit R3.* On November 6, 1985, the Debtor and SBU consolidated the MFM and the mortgage obligation assigned by Troy for a new aggregate debt due SBU by the Debtor of $1,100,000.00. *Freddie Mac R4.* As security for this indebtedness, the Debtor, as Lessor, also assigned to SBU on November 6, 1985 all the rents, deposits and monies due under current and future leases at the Yorkshire Manor. *Freddie Mac Exhibit R7.*

On November 22, 1985, SBU assigned its entire interest in the mortgage, basically six mortgages, and assignment of the leases' rents and profits to Freddie Mac. *Freddie Mac Exhibit R6 & R8.*[1]

The Debtor thereafter defaulted on the Freddie Mac consolidated mortgages and a foreclosure action was commenced on October 23, 1987 in the New York State Supreme Court, County of Onondaga. *Freddie Mac Exhibit R9* (summons and complaint). On October 26, 1987, the State Supreme Court appointed Michael Bright ("Bright") as Receiver in that action. *Freddie Mac Exhibit R14.*

The Debtor served an Answer in the foreclosure action, *Freddie Mac Exhibit R10,* and Freddie Mac moved for summary judgment. The motion was orally granted on September 14, 1988 but the state court judge granted the Debtor thirty days to obtain new financing to pay the consolidated mortgages. *Freddie Mac Exhibit R13.*

On October 13, 1988, as indicated, the Debtor filed the current Chapter 11 case and a Consent Order was entered October 19, 1988 essentially continuing the state court receivership until the rights of the parties concerned were examined and if need be adjudicated. Said Order expired on its own terms if no further court order was handed down by October 25, 1988 or the Debtor consented to an extension. The instant contested matter was filed on October 27, 1988. On November 7, 1988, the state court judge signed the order granting summary judgment to Freddie Mac. *Freddie Mac Exhibit R13.*

---

**1.** There is no dispute as to the validity of the mortgages or the assignments, duly recorded in the office of the Clerk of Onondaga County.

On December 5, 1988, SBU, as seller/servicer, timely filed a secured proof of claim on behalf of Freddie Mac in the sum of "$1,457,701.81, plus interest, costs, expenses, reasonable attorney's fees."[2] *Freddie Mac Exhibit R16.*

At the hearings held before the Court on December 5 and 9, 1988, it was established by the testimony of William Taylor, an SBU employee in charge of servicing commercial loans, that 1) the principal balance on the Freddie Mac debt, as of December 1, 1988, was $1,095.660.87, 2) interest was accruing at a per diem rate of $383.94 and 3) the annual interest accruing on the existing principal balance amounted to $138,217.62. *Id.*

Supported by the testimony of State Court Receiver Bright, Freddie Mac successfully introduced an unaudited income and expense summary for Yorkshire Manor produced by his accountant for the period commencing with November 1987 through October 31, 1988, which reflected a net profit of $110,103.16. *Freddie Mac Exhibit 22.* Bright further stated that the balance of the receiver bank account on October 14, 1988 collected on rental and laundry machine income was $118,365.58, from which an expense of $2,093.20 and his fees, five percent of the income under New York law, would have to be paid. *Freddie Mac Exhibit 21.*

Bright also testified that the rent roll as of October 15, 1987 supplied by the Debtor's president, Gross, indicated the existence of $11,965.00 in security deposits, yet he received only $1,075.49 from Gross when he sought the turnover of those deposits. *Freddie Mac Exhibit 24.* Bright prepared a list of discrepancies found in the rent roll delivered to him by Gross. *Freddie Mac Exhibit 25.* However, it became apparent on cross examination that the list itself contained some errors concerning the vacancies in certain apartments.

In addition to rent roll discrepancies, Bright found that 1) no separate bank account was maintained for security deposits, 2) some expenses were being paid in cash, 3) several smoke detectors were inoperable for which he received calls from the tenants, 4) a number of stairways were deteriorated and had to be repaired, 5) during the first sixty days of his receivership three sewer backups occurred, 6) tenant utility bills were being charged to the Debtor, 7) snow removal by a maintenance crew was inadequate, 8) there was no regular maintenance schedule, and 9) the Town of Camillus refused to service a water leak at Yorkshire Manor because they claimed nonpayment for previous work, an allegation Bright admitted never discussing directly with Gross. *See, e.g., Freddie Mac Exhibits 26 & 27* (Letters from Bright to a David Yaffee, dated Jan. 7, 1988 and Feb. 10, 1988 discussing Niagara Mohawk billing and preventative sewer maintenance).

Freddie Mac offered the expert testimony of John R. Mako, Jr. ("Mako"), who appraised the Yorkshire Manor using both a market data and income approach to value. Mako concluded that the income approach to value should be given the greatest weight and that the property value was $1,400,000.00 as of October 31, 1988. *Freddie Mac Exhibit 28.*

In addition to the Freddie Mac mortgage, Yorkshire Manor is encumbered by a mortgage recorded July 7, 1987 and dated December 29, 1986 held by Daniel Elstein, securing $9,000.00, and judgments docketed by Marine Midland Bank on May 13, 1988 and Patricia Micholski on August 23, 1988, in the sums of $60,743.10 and $1,573.75, respectively. Both pertinent exhibits were received into evidence by the Court upon the parties' stipulation. *Freddie Mac Exhibit R10* (Debtor's Verified Amended Answer in state court foreclosure action, dated Dec. 29, 1987); *Freddie Mac Exhibits R11 & R12* (Yorkshire Manor Ab-

---

**2.** The total proof of claim included estimated attorneys fees of $47,000.00 through November 21, 1988 and estimated costs and expenses of foreclosure of $2,000.00 premised upon no further opposition by the Debtor in state court.

The parties stipulated that, if necessary, these estimates would be the subject of a separate hearing. Freddie Mac also claimed an administrative expense priority for post-petition interest.

stract of Title, Oct. 23, 1987 and Oct. 17, 1988).

The 1988 Town and County Tax bill for Yorkshire Manor was $52,423.08, which included the re-assessed 1987–88 School Tax of $21,255.56, while the 1988–89 School Tax bill was $20,902.40. *Freddie Mac Exhibits 29 & 30.*

In opposition to the instant motion, the Debtor called Gross as its witness. Gross testified to both an educational background and experience related to real estate sales and real estate management. She claimed an interest in two partnerships which owned and operated two other apartment complexes, one located in the City of Syracuse, the other in suburban Liverpool, New York, containing a total of 227 units.

Gross indicated that the Debtor was formed in 1971 to purchase Yorkshire Manor. Gross is president of Debtor and apparently its majority stockholder.

According to Gross, the Debtor experienced cash flow problems in 1986 primarily due to a higher vacancy rate stemming from lower interest rates which caused many apartment dwellers to purchase homes and the closing down of Allied Chemical, a major employer in the Syracuse area, many of whose employees were tenants at Yorkshire Manor. As a result of these cash flow problems, the Debtor requested, around October 1986, and subsequently received a moratorium from Freddie Mac on its monthly mortgage payments for a period of nine months.

Gross further testified that in August, 1987, the Debtor sought unsuccessfully to refinance its mortgage debt with Freddie Mac. It then approached the Continental Securities Corporation with regard to a Co–Insured 223(f) Loan under the auspices of the Department of Housing and Urban Development ("HUD"). *Freddie Mac Exhibit 34* (Letter from Robert P. Corp ("Corp"), Mortgage Officer to Gross, Nov. 19, 1987). Nonetheless, in order to participate in the HUD program, the Debtor made certain repairs to Yorkshire Manor. *Debtor Exhibit 8* (photographs of Yorkshire Manor "AFTER RE–HAB IN SEPTEMBER 1988"). Gross related that, contrary to

what she had been told by its representatives, Freddie Mac commenced a foreclosure action of its mortgage in state court in October 1987 and, in spite of the Debtor's defense, was granted summary judgment on September 14, 1988. She testified that the Debtor filed the Chapter 11 case on October 13, 1988 to stay the foreclosure sale and gain additional time to refinance the Freddie Mac debt, possibly through a New York State agency identified as the Housing and Finance Agency ("HFA").

Gross also stated that although the Chapter 11 petition and schedules listed herself and her daughter, Rosenthal, as unsecured creditors, neither expected to receive anything from the Debtor. In addition to the unsecured claims of Gross and Rosenthal, Debtor's Chapter 11 petition and schedules contained approximately $3,900.00 in unsecured debts. *Freddie Mac Exhibit R15.*

The Debtor offered a Management Entity Profile ("Profile") which had been prepared for HUD in February 1988. *Debtor Exhibit 3.* The Profile enumerated the management procedures undertaken by the Debtor in its operation of Yorkshire Manor. *Id.* Gross stated that the monthly income of the Debtor in October, 1987, was approximately $21,700.00 and that Yorkshire Manor was in "excellent condition" as a result of the completion of substantial improvements in the summer of 1987. She outlined the Debtor's practices with regard to smoke alarms and offered correspondence from the Code Enforcement Office of the Town of Camillus, dated May 11, 1987, which acknowledged defects and corrective action taken while the Deputy Fire Marshall was present. *Debtor Exhibit 4.*

Gross also provided a letter, dated February 4, 1988, from the Superintendent of the Camillus Consolidated Water Districts indicating that all work performed at Yorkshire Manor had been paid for by the Water District. *Debtor Exhibit 5.* She testified that the work was done in exchange for an easement granted by the Debtor.

The Debtor offered a joint application to HFA and HUD, submitted in May 1988, in

connection with the refinancing of the Freddie Mac mortgage debt which was received only for the limited purpose of showing that it had been made and not for proof of its contents. *Debtor Exhibit 9.*

Finally, Gross opined that she would list Yorkshire Manor for sale at 1.8 million dollars and that, if necessary, she would utilize her equity in the other two apartment complexes, which she valued at one million dollars, to reorganize Yorkshire Manor.

On cross-examination, Gross conceded that she wasn't sure if she had produced all of the Debtor's records in response to the Freddie Mac subpoena issued in connection with this contested matter, but claimed that she had gathered the most she could in the short time she had. *Freddie Mac Exhibit 31.* She did admit that she did not produce all of the checks to substantiate her estimate of the income and expenses of Yorkshire Manor.

Gross acknowledged that certain debts were omitted from the Debtor's petition, specifically the Elstein mortgage and the Marine Midland judgment, and explained on redirect that it was the result of her not reading the documents prior to execution.

Concerning the improvements made by the Debtor at Yorkshire Manor during 1987, Gross could not adequately explain why an enclosure in a letter from the Debtor's pre-Chapter 11 counsel, Bond, Schoeneck & King, Esqs., entitled "Breakdown of Funds Spent on Yorkshire Manor Rehabilitation–1987," referred to some $39,-895.00 in improvements from May through November, yet the enclosed supporting invoices totalled only $7,000.00. *Freddie Mac Exhibit 32* (Letter from William R. Moriarty, Esq. ("Moriarty") to Robert K. Weiler, Esq. ("Weiler"), dated May 2, 1988).

Gross acknowledged receipt of the letter dated November 19, 1987 from the Continental Securities Corporation ("CSC") indicating that were it to grant the Debtor a Co–Insured HUD 223(f) loan to refinance the Yorkshire Manor debt, it would not lend in excess of $1,350,000 which, after satisfying the existing liens and the necessary fees and costs, would result in a shortfall, as of the date of the letter, ranging from $115,000.00 to $165,000.00. *Freddie Mac Exhibit 34.*

On further cross-examination, Gross contended that the balance in the security deposit account was only $1,000.00 because she had returned the remainder of the deposits to tenants and that she had cooperated with the Receiver in turning over pertinent records of Debtor.

On redirect examination, she blamed Bright's refusal to turn over the Debtor's relevant records, at her request, for its failure to file a 1987 Federal tax return.

The Debtor also offered the testimony of David F. Peatfield ("Peatfield"), president of the Peatfield Company, Ltd., a real estate appraisal firm, who testified that as of November 23, 1988, Yorkshire Manor had a fair market value of $1,610,000.00. *Debtor Exhibit 1.*

Peatfield utilized three approaches to value,—market, cost and income—and contended that the property lent itself to all three valuation approaches. In reaching his final estimate of value, however, Peatfield concluded that the cost approach was the least accurate and that the market and income approaches should be given equal weight.

On cross-examination, Peatfield acknowledged that in applying the income approach, he capitalized market or economic rents rather than actual rents, as did Mako. He also admitted that he did not utilize the actual tax bills in his appraisal and had he incorporated the actual taxes in his stream of expenses it would have decreased his overall estimate of value utilizing the income approach by $88,000.00.

In arriving at his capitalization rate of ten percent, Peatfield rejected the band of investment theory utilized by Mako, and instead used an alternate method based upon a review of comparable apartment sales. Peatfield opined that this alternate method was more accurate as a result of the changing environment for real estate investments due to the impact of the Tax Reform Act of 1986.

When questioned about the accuracy of the mortgage component of the band of investment theory, Peatfield acknowledged that a typical seventy-five percent mortgage based upon his estimated value of $1,610,000.00 would not be sufficient to pay off the Freddie Mac debt. He also admitted that his appraisal did not reflect value from the standpoint of a sale conducted within a bankruptcy case nor did it include the services of a mortgage broker or the real property capital gains tax. Peatfield further stated that, in his opinion, the Tax Reform Act of 1986 has not had an adverse effect on the sale of apartment complexes similar to Yorkshire Manor.

In rebuttal, Freddie Mac called E. Richard Smith ("Smith"), a certified public accountant. Smith testified that he examined the records produced by the Debtor in response to the Freddie Mac's subpoena upon Gross and that, after examining those records, it was impossible for him to produce a cash basis compilation. *Freddie Mac Exhibit 36* (ten individual folders for months January through October 1987 for Yorkshire Manor containing miscellaneous items such as cancelled checks, summary of petty cash and transportation expenses and receipts). Smith opined that all that is needed to maintain a cash basis accounting system is a check book and a general ledger but that Debtor did not produce either record. *Freddie Mac Exhibit 36*.

Also on rebuttal, Bright testified that, in spite of Gross' testimony that she had returned all but $1,000.00 of the security deposits, he received several requests from tenants for the return of their security deposits and referred them to Gross. Bright further stated that he did not withhold tax records from the Debtor and that he generally dealt with Bond, Schoeneck & King regarding his Yorkshire Manor receivership rather than directly with Gross. *See, e.g., Freddie Mac Exhibit 37* (Letter from Bright to Moriarty, dated Feb. 26, 1988).

At the December 5, 1988 hearing, the United States Trustee stated for the record that under the limited circumstances of this case, he did not view the prior pending Chapter 11 case to bar the current filing. With regard to Troy's assignment of the debt and mortgage to SBU, and then presumably to Freddie Mac, he stated that res judicata was not an issue since nothing in the prior Chapter 11 had been litigated.

On February 2, 1989, the Debtor filed a plan of reorganization.

## DISCUSSION

■ Initially, Freddie Mac argues that in filing the current Chapter 11 case, the Debtor has violated the rights granted to Troy under the Confirmed Plan and Confirmation Order dated January 18, 1983 wherein the Debtor waived its right to prevent a foreclosure sale by Troy "or in any way alter[ing] any other right of Troy" in the event of its default. *Freddie Mac Exhibit R2* at p. 12. Freddie Mac contends that when Troy assigned the Debtor's mortgages to SBU in 1985, it expressly assigned its rights under the Confirmed Plan and, presumably, when SBU in turn assigned the mortgages to Freddie Mac some three weeks later, those same rights were included. Thus, it maintains that the filing of the current Chapter 11 on October 13, 1988 violates rights and obligations solidified in the first Chapter 11 case and constituted a prohibited modification, under Code § 1127(b), of the Debtor's substantially consummated Confirmed Plan within the still-open Chapter 11 case.

The Court has examined the assignment by Troy to SBU dated November 4, 1985, *Freddie Mac Exhibit R5*, and it does not reach the conclusion that Troy's rights, insofar as they related to the Debtor's default under the Confirmed Plan, were assigned to SBU. More significantly, the Confirmed Plan does not refer to the assignment from SBU to Freddie Mac, nor any potential assignment for that matter, and while it explicitly provides for Gross, as Trustee for Rosenthal, to exercise an exclusive purchase option of Troy's right, title and interest in the mortgage, there is no successor-in-interest language with regard to Troy. *Compare Freddie Mac Exhibit R2 with Freddie Mac Exhibit R6.*

A further rejection of Freddie Mac's initial argument is found in the fact that the MFM executed on November 6, 1985 and simultaneously consolidated and extended with the Debtor's existing indebtedness then due and owing SBU finally discharged the rights of Troy as contained in the Debtor's Confirmed Plan. As the Debtor points out, a new post-petition and post-confirmation debt, double the amount of the Troy debt, was created that could not have been treated in the Confirmed Plan. *Freddie Mac Exhibits 3, 4.*

Were it otherwise, Freddie Mac would have presumably pursued its rights against the Debtor in accordance with the Confirmed Plan and re-scheduled a foreclosure sale with judgment in hand, rather than resort to the commencement of its own separate foreclosure action in October 1987.

The two cases relied upon by Freddie Mac are factually inapposite to the case at bar inasmuch as they involved defaults arising out of previously confirmed plans with the identical debt and creditor and second filings which the courts perceived as "end-run modifications" around substantially consummated plans. *See In re Colony Square, Co.,* 62 B.R. 48 (N.D.Ga.1985); *In re At Of Maine, Inc.,* 56 B.R. 55 (Bankr. D.Me.1985). *See also In re Northampton Corp,* 37 B.R. 110 (Bankr.E.D.Pa.), *aff'd,* 59 B.R. 963 (E.D.Pa.1984). The satisfaction of the Troy debt through the negotiation of further indebtedness from SBU, an entirely new lender and Freddie Mac's assignor created, upon consolidation, an entirely new debt which essentially rendered the Confirmed Plan, and the Chapter 11 case, irrelevant with regard to Freddie Mac. *See Freshman v. Atkins,* 269 U.S. 121, 46 S.Ct. 41, 70 L.Ed. 193 (1925); *In re Prudential Insurance Co. of America v. Colony Square Co.,* 29 B.R. 432, 436 (W.D. Pa.1983); *In re Prudential Insurance Co. of America v. Colony Square Co.,* 40 B.R. 603, 605 (Bankr.N.D.Ga.1984), *aff'd,* 62 B.R. 48 (N.D.Ga.1985). *Cf. In re Jartran,*

*Inc.,* 71 B.R. 938 (Bankr.N.D.Ill.1987), *aff'd,* 87 B.R. 525 (N.D.Ill.1988) (second Chapter 11 petition with goal of liquidation, in face of first petition's unsuccessful reorganization, was separate, new and different Chapter 11 case).

Assuming arguendo a nexus did exist between Freddie Mac and the Confirmed Plan, the Court is led to conclude that, in fact, the Debtor's Confirmed Plan was substantially consummated in November 1985 when the Troy debt was satisfied because (A) there was no property to be transferred under the Confirmed Plan, (B) the Confirmed Order provided for the termination of the existing receivership and the Debtor's resumption of the management of Yorkshire Manor and (C) the commencement of distribution to claimants under the Plan appeared to have begun within a month of the entry of the Confirmation Order. *See Freddie Mac Exhibit R2,* at pp. 3–5; *Freddie Mac Exhibit,* at Exhibit A, para. 7. Thus, all 3 elements of Code § 1101(2) were functionally present by more than a mere preponderance to warrant a finding of substantial consummation in November 1985, almost three years after the Confirmation Order.[3] *See Jorgensen v. Federal Land Bank of Spokane,* 66 B.R. 104, 106–107 (Bankr. 9th Cir.1986); *Federal Land Bank Of Louisville v. Gene Dunavant And Son Dairy (In re Gene Dunavant And Son Dairy),* 75 B.R. 328, 331–332 (M.D.Tenn.1987); *In re Charterhouse, Inc.,* 84 B.R. 147, 152 (Bankr.D.Minn.1988); *In re Hayball Trucking, Inc.,* 67 B.R. 681 (Bankr.E.D.Mich.1986); 5 L.King, COLLIER ON BANKRUPTCY ¶ 1101.02 (15th ed. 1988). At this time, the right to seek modification of the Debtor's Confirmed Plan was statutorily terminated under Code § 1127(b), which was designed to promote finality in the reorganization process. *See In re Charterhouse, Inc., supra,* 84 B.R. at 152. *See also Metropolitan Life Insurance Co. v. Olsen (In re Olsen),* 861 F.2d 188, 190 (8th Cir.1988); Recent Devel-

---

**3.** The Court notes that the docket of the first Chapter 11, 81–00173, bears an entry on September 30, 1986 of document # 157 recited as "Petition By Debtor's Attorney For Substantial Consummation Pursuant to FRCP [sic] 2015(6) —filed 6/2/86." However, the docket thereafter reflects neither the entry of an Order of Substantial Consummation nor a Final Decree.

opments, *Postconfirmation Modification,* 5 BANKR.DEV.J. 211 (1987).

■ While the Court observes that substantial consummation is *not* synonymous with an order closing the prior Chapter 11 case, it does not view the Debtor's present Chapter 11 case as a subtle effort to modify its completed Confirmed Plan in derogation of Code § 1127(b) since the new debt, and the creditor status of Freddie Mac, did not come into existence until *after* the Confirmed Plan's substantial consummation. The substantial consummation of the Debtor's plan in 1985 not only precluded modification but was unable to bind entities not yet parties-in-interest nor vest rights not yet in existence.[4] *See* Code §§ 1127(b), 1141(a); Bankr.R. 2015(a)(6–7), 3022; *In re Northampton Corp, supra,* 37 B.R. at 113. *Cf. In re Culbreth,* 87 B.R. 225 (Bankr.M.D.Ga.1988) (finding Code § 1127(b) "irrelevant", court confirms Chapter 12 plan filed nine months subsequent to substantial consummation of Debtor's Chapter 11 plan and entry of final decree therein). Indeed, the Court notes that, but for the unsecured claims of Gross and Rosenthal arising out of purported personal loans for capital improvements, the balance of the unsecured debt listed in the petition in the instant Chapter 11 appears to have been incurred subsequent to the substantial consummation of the first Chapter 11 case. *Freddie Mac Exhibits R15, 32.*

■ Moreover, as Freddie Mac itself notes, "the mere successive filing alone may not be itself grounds for dismissal." *Post–Trial Memorandum On Behalf Of Federal Home Loan Mortgage Corporation In Support Of Motion To Dismiss* at p. 14 (Dec. 29, 1988). *See In re McDermott,* 78 B.R. 646, 651 (Bankr.N.D.N.Y. 1985). There is no per se rule against successive filings and a bona fide change in circumstances may justify a debtor's multiple filings. *See Downey Savings And Loan Association (In re Metz),* 820 F.2d 1495, 1498 (9th Cir.1987) (citing, in Chapter

13 context, *Johnson v. Vanguard Holding Corp. (In re Johnson),* 708 F.2d 865, 868 (2d Cir.1983)). Thus, a doubling of its debt-load and an inability to make the resultant payments due to Yorkshire Manor's unforeseen levels of tenant vacancy sparked by a drop in interest rates, encouraging home buyers, and the closing of a nearby company, which had provided a tenant source, could presumably account for the requisite change in the Debtor's circumstances sanctioning the current filing.

■ However, an inquiry into the propriety of successive filings for purposes of dismissal invariably encompasses the question of good faith since it examines whether or not there was a pattern or strategy behind the filings to frustrate statutory requirements and abuse the bankruptcy process. *See In re McDermott, supra,* 78 B.R. at 651; *Mortgage Mart, Inc. v. Rechnitzer (In re Chisum),* 847 F.2d 597, 600 (9th Cir.1988) (citing *In re Metz, supra,* 820 F.2d at 1497). While there is a legal distinction between good faith in filing a petition and good faith in proposing a plan under Code § 1129(a)(3), (*In re Madison Hotel Associates,* 749 F.2d 410, 424–425 (7th Cir.1984)); *In re Stolrow's Inc.,* 84 B.R. 167, 171 (Bankr. 9th Cir.1988), *In re McStay,* 82 B.R. 763, 768 (Bankr.E.D.Pa. 1988), it is well settled that the bad faith filing of a Chapter 11 case is cause for dismissal under Code § 1112(b) that could justify sanctions. *See In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 985 (Bankr. N.D.N.Y.1988) (citing cases); *In re HBA East, Inc.,* 87 B.R. 248, 258–259 (Bankr.E. D.N.Y.1988) (citing cases); *Mauna Lani Resort, Inc. v. Endrex Investments, Inc. (In re Endrex Investments, Inc.),* 84 B.R. 207 (Bankr.D.Colo.1988). As an important "policing tool" of Chapter 11, the good faith requirement—from filing through confirmation—is the doctrine that arms the bankruptcy courts of equity in preserving the reorganization process for its intended recipients. *See In re HBA East, Inc., supra,* 87 B.R. at 258. *See also In re*

---

**4.** The Court reaches this conclusion in light of the particular facts before it and need not comment on the generally imprudent and precarious posture of a substantially consummated Chapter 11 case that has never been closed upon a final decree.

*Schlangen,* 91 B.R. 834, 837 (Bankr.N.D. Ill.1988); *In re Clinton Centrifuge, Inc.,* 72 B.R. 900, 904 (Bankr.E.D.Pa.1987) (quoting *In re Victory Construction Co.,* 9 B.R. 549, 558 (Bankr.C.D.Cal.1981)).

The determination of whether a Chapter 11 filing is made in good faith demands the objective consideration of "the collective impact of facts and circumstances, not a single feature in a particular case" to ascertain a valid reorganization purpose consistent with the debtor's economic reality. *See In re Copy Crafters Quickprint, Inc., supra,* 92 B.R. at 985; *In re Endrex Investments, Inc., supra,* 84 B.R. at 210 (citing to *Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.),* 779 F.2d 1068, 1072 (5th Cir.1986)); *In re McStay, Inc., supra,* 82 B.R. at 767–768 (quoting *In re Clinton Centrifuge, Inc., supra,* 72 B.R. at 906)). Thus, the fact that the Chapter 11 filing was triggered by state court proceedings adverse to the debtor has not been found to constitute, by itself, cause for dismissal where, prior to filing, the debtor had an ongoing business with employees and several creditors other than the movant. *See id.* at 908. *See also In re North Redington Beach Associates, Ltd.,* 91 B.R. 166 (Bankr.M.D.Fla.1988) (motion to dismiss for bad faith filing, ten minutes before foreclosure sale, denied where debtor's single asset consisted of brand new hotel operating under Hilton franchise with eighty plus employees and its 120 day exclusive period to file plan not set to expire for another two months). "The real test that still remains is the presence of honest intention of the Debtor and some real need and real ability to effectuate the aim of the reorganization even if this involves the total liquidation of the assets." *Id.* at 169. *Compare with In re HBA East, Inc., supra,* 87 B.R. at 248 (motion to dismiss for cause based upon debtors' lack of good faith filings granted where, *inter alia,* only possible assets to fund reorganization plan were boxing promotional contracts of highly speculative value and disputed ownership and control).

Indeed, Freddie Mac's next argument is that the instant filing was made in bad faith because, in addition to attempting to effectuate a prohibited modification, it seeks to cloud what is essentially a two party dispute easily resolved in a pending state court action by engulfing it in an alleged reorganization pursuant to Chapter 11 of the Code on the eve of an adverse judgment in that state court action. Further, Freddie Mac maintains that the Debtor's records are wholly inadequate, its cash flow could not even remotely support a reorganization, and that, since 1979, Yorkshire Manor has been under the management of a court appointed receiver with the exception of the period between 1983 and 1987.

The Debtor counters with the contention that good faith or the lack thereof is one of the most nebulous concepts in bankruptcy law and that if, in fact, it exists as a basis for dismissing a voluntary case at all, it must be very narrowly confined to the "rare" case.

The Court concludes that with regard to the issue of bad faith, as evidenced by the totality of circumstances surrounding the two Chapter 11 filings, it must agree with the Debtor at this early juncture of the case. "[B]ankruptcy courts should not precipitously terminate a Chapter 11 case by prematurely converting or dismissing the case." *In re McDermott, supra,* 78 B.R. at 651.

While the Court acknowledges the findings of the Eleventh Circuit Court of Appeals in *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir.1988) as evidencing a trend toward clarifying bad faith in the Chapter 11 filing context, this Court believes that the Eleventh Circuit's decision is factually distinguishable and conceptually opposed to its own view of Chapter 11 relief.

Factually, *In re Phoenix Piccadilly, Ltd., supra,* 849 F.2d at 1395, paints a picture of a debtor who threatened a Chapter 11 filing as a stall tactic on more than one occasion, and then purposely filed its petition in a venue located some seven hundred miles from the location of its apart-

ment complex, its employees, its secured and unsecured creditors and the state court in which the foreclosure actions were pending.

Conceptually, the Circuit Court made observations such as "the prospects of a successful reorganization do not override, as a matter of law, the finding of bad faith", and "[w]e reject the debtor's argument that the bankruptcy court cannot ever dismiss a case for bad faith if there is equity in the property because the presence of equity indicates the potential for a successful reorganization." *Id.* at pp. 1394, 1395.

What these observations by the Eleventh Circuit seem to overlook is that rarely is the filing of a Chapter 11 the culmination of a quiet and uneventful relationship between a debtor and its creditors. It is more often than not the final chapter in a stormy pre-petition relationship characterized by the maneuvering of both parties— which might be perceived in another context as bad faith. To swing the pendulum in favor of the creditors to the extent suggested by the Eleventh Circuit in *In re Phoenix Piccadilly, Ltd., supra,* 849 F.2d at 1393, is perhaps to endanger the ability to freely resort to Chapter 11 as a means of invoking judicial intervention when all other avenues of relief have been exhausted.

This Court does not suggest that when a debtor evinces a clear intent to abuse the judicial process and the objectives of Chapter 11, it should nonetheless be afforded the Code's protections. However, the Court does conclude that such a good faith determination at the inception of the case is neither mandated by statute nor should it even be considered except under the most egregious circumstances, since the taint of bad faith can be far-reaching. *See Natural Land Corp. v. Baker Farms, Inc., (In Natural Land Corp.),* 825 F.2d 296, 298 (11th Cir.1987); *see, e.g., In re Copy Crafters Quick Print, Inc., supra,* 92 B.R. at 973; *In re HBA East, Inc., supra,* 87 B.R. at 248.

Freddie Mac's allegation that dismissal for cause is warranted simply because the Debtor has failed to articulate any plan of reorganization or does not demonstrate a cash flow necessary to support reorganization—as evidence of bad faith—is likewise premature and too harsh a remedy in a case which was filed approximately two months prior to the hearing in the instant contested matter with two months remaining in the Debtor's exclusivity period for filing a plan under Code § 1121(b). *See In re Copy Crafters Quick Print, Inc., supra,* 92 B.R. at 985; *In re North Redington Beach Associates, Ltd., supra,* 91 B.R. at 169–170; *In re McDermott, supra,* 78 B.R. at 652.

Thus, the Court can only conclude that relief for Freddie Mac under the general "cause" category of Code § 1112(b)—for the Debtor's alleged bad faith—is not available while relief under Code § 1112(b)(1) and (2) is premature at this point in time.

Turning to Freddie Mac's motion to lift or modify the automatic stay imposed pursuant to Code § 362, the movant argues that, based upon the Debtor's own appraisal testimony, the value of Yorkshire Manor fails to reflect any equity held by the Debtor and that the Debtor has failed to demonstrate that it can effectively reorganize, negating the need to retain Yorkshire Manor within the protection of an automatic stay.

Freddie Mac's initial motion papers also suggested, as the Eleventh Circuit observed in *In re Phoenix Piccadilly, Ltd., supra,* 849 F.2d at 1394, that the Debtor's bad faith filing was "cause" within the meaning of Code § 362(d)(1) to lift the stay. The Court, having concluded that the Debtor's filing of the instant Chapter 11 does not constitute bad faith and therefore "cause" within the meaning of Code § 1112(b), also denies modification of the stay on the ground of "cause" and entertains Freddie Mac's motion only on the basis of Code § 362(d)(2). *See In re Little Creek Development Co., supra,* 779 F.2d at 1071–1073. Accordingly, subsections A and B focus the Court's attention on the Yorkshire Manor—its valuation, the existence of any equity held by the Debtor and its necessity for the Debtor's effective reorganization.

In what evolved, as it must, into a valuation hearing under Code § 506(a) and Bankr.R. 3012, *see In re Pourtless*, 93 B.R. 23, 25 (Bankr.W.D.N.Y.1988), within the instant motion, Freddie Mac's appraiser Mako utilized both the market and income approaches to value, but concluded that, due to the property's appeal for investment purposes, the income approach was the most accepted appraisal method. *Freddie Mac Exhibit 28*, p. 30. Utilizing the income approach, Mako capitalized the net operating income of Yorkshire Manor, utilizing market or economic (as opposed to actual) rents at a rate of 10.82 percent, which he derived by use of the generally recognized band of investment theory. Mako reasoned that while the income approach reflected a value of $1,430,000 when weighed against a market data value ranging between $1,375,000 and $1,380,000, he would conclude the fair market value of the property on October 31, 1988 of $1,400,000. *Id.* at pp. 30–31.

Debtor's appraiser, Peatfield, took very similar approaches to value and, while also utilizing the so-called cost method, he gave it little consideration in his final estimate of $1,610,000.00 on November 23, 1988. *Debtor Exhibit 1*, p. 38. Likewise, Peatfield considered comparable sales of apartment complexes in the general vicinity of Yorkshire Manor and then adjusted those sales to the subject property to reach a value of $1,620,000, in contrast to his value of $1,600,000.00 under the income approach. *Id.* In disagreeing with Mako, the Debtor's appraiser weighed the income and market approaches equally because he opined that investors in smaller apartment complexes such as the Yorkshire Manor utilized the market approach "as a check against the income analysis." *Id.*

Based upon the testimony of both appraisers, the Court concludes that the income approach most accurately reflects the value of Yorkshire Manor. Therefore, the Court will focus primarily on that approach to· value.

Debtor's appraiser made what the Court considers two erroneous determinations in his appraisal of $1,600,000.00. First, he failed to include the correct amount of real property taxes in his expense stream, and second, he utilized a capitalization rate which was subjectively reduced from that indicated by the band of investment theory, without adequate or convincing explanation.

Thus, if Peatfield's appraisal were corrected to reflect Total Expenses of $123,032 ($114,232 + $8,800 additional taxes), the net operating income of Yorkshire Manor would be $152,383, not $161,183. *Id.* at p. 37. Capitalizing the net operating income by utilizing a rate of 10.82 percent would reflect a fair market value of Yorkshire Manor of $1,408,345, some twenty-two thousand dollars *less* than Mako's figure under the income approach.

While there are other inconsistencies between the income approaches utilized by each appraiser, the Court is of the opinion that they were exemplified by the differences in the capitalization rate and the real property tax expense. Suffice to say, the Court will not inject itself into the role of real estate appraiser and thus accepts $1,400,000 as the maximum fair market value of Yorkshire Manor the date the instant Chapter 11 was filed, October 13, 1988. *See In re Markowitz Building Co.*, 84 B.R. 484, 487 (Bankr.N.D.Ohio 1988) (valuation for purposes of Code § 362(d) should be based upon fair market value).

In analyzing equity under Code § 362(d)(2)(A), the Court looks at the difference, if any, between the value of the property at issue and all encumbrances against it—a concept separate and apart from that of adequate protection under Code § 362(d)(1), which examines the value of the property against the movant's lien and all those senior. *See Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400–1401 & n. 2 (9th Cir.1984); *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir.1984); *In re Cardell*, 88 B.R. 627, 631 (Bankr.D.N.J.1988); *In re Missouri Flats Associates*, 86 B.R. 634, 638 (Bankr.E.D.Cal.1988); *In re Diplomat Electronics Corp.*, 82 B.R. 688, 692 (Bankr. S.D.N.Y.1988); *In re Belton Inns, Inc.*, 71 B.R. 811, 817 (Bankr.S.D.Iowa 1987); *First Agricultural Bank v. Jug End In the*

*Berkshires, Inc. (In re Jug End In The Berkshires, Inc.)*, 46 B.R. 892, 901 (Bankr. D.Mass.1985); *La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283, 287 (Bankr.S.D.Cal.1982). *See also* M. Bienenstock, *Bankruptcy Reorganization*, 134–135 & n. 92–93 (1987). *But see Central Fla. Prod. Credit Ass'n v. Spring Garden Foilage, Inc. (In re Spring Garden Foliage, Inc.)*, 15 B.R. 140, 143 (Bankr. M.D.Fla.1981); *Wolford v. Wolford Enters., Inc. (In re Wolford Enters., Inc.)*, 11 B.R. 571, 574 (Bankr.S.D.Va.1981).

In real estate, equity is "the remaining interest belonging to one who has pledged or mortgaged his property, or the surplus of value which may remain after the property has been disposed of for the satisfaction of liens. The amount or value of a property above the total liens or charges." BLACK'S LAW DICTIONARY 484 (5th ed. 1979). Thus, if the movant holds the only lien on the property and it exceeds the value, not only is the creditor undersecured, but "the debtor does not have an equity in such property." *See e.g., United States Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.* ("*Timbers*"), 484 U.S. 365, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988) *aff'g*, 808 F.2d 363 (5th Cir.1987) (rehearing en banc), *aff'g*, 793 F.2d 1380 (1986).

Relying upon Freddie Mac's proof of claim stipulated into evidence and its valid security interest in rents, deposits and all monies due under the Yorkshire Manor's leases, *Freddie Mac Exhibits R7, R8, R16*, the Court finds its total allowed claim on the date of filing to be $1,284,858.57, rendering it oversecured. This figure is reached by first computing the sum of $1,389,120.87 from the proof of claim through the inclusion of a principal of $1,095,660.87, interest from December 1,

1986 through October 14, 1988 of $262,231.02, pre-petition late charges of $12,670.02 (twenty-two months at $575.91 per month) and taxes advanced from January 1988 of $18,558.96. *Freddie Mac Exhibit R16. See also* Bankr.R. 3001(f), 3003(c)(4). Second, the amount of accrued rent, less an expense of $2,093.20 and Bright's receiver's fees under New York Civil Practice Law and Rules § 8004 (McKinney 1981), brings the $118,365.58 held in the bank account on the date of filing down to some $104,262.00, which is then deducted from Freddie Mac's allowed amount by virtue of its security interest, provided for under Code § 552(b). *See Timbers, supra*, 484 U.S. at ——, 108 S.Ct. at 631.[5]

In addition, the Yorkshire Manor is further encumbered by the Elstein mortgage securing the sum of $9,000 and the judgments of Marine Midland Bank and Patricia Micholski of $60,743.10 and $573.75, respectively.[6] This $70,316.85, when added to Freddie Mac's claim, results in total encumbrances of $1,355,176.72 against the Debtor's Yorkshire Manor's going concern value of $1,400,000.00, irrespective of Freddie Mac's attorney's fees and costs in the foreclosure action, pre- and post-petition, *Freddie Mac Exhibit R16* (indicating an estimated $47,000 in pre- and post-petition legal fees and $2,000 in costs of foreclosure), and post-petition interest and other fees and costs under Code § 506(b). *Freddie Mac Exhibit R3* (MFM at p. 1); *Freddie Mac Exhibit R7* (SBU Assignment of Debtor's Lease Monies to Freddie Mac at p. 5); *cf. Freddie Mac Exhibit R4* (Rider I of extension/consolidation agreement); *Timbers, supra*, 484 U.S. at ——, 108 S.Ct. at 630–632. It is clear that the difference of $44,823.28 will be more than consumed by the aforementioned expenses, even assuming the post-petition interest is set off by the

5. The Court notes that Freddie Mac's security interest in rents and other monies flowing from the leases does not appear to include income from the on-premises laundry machine[s]. *Freddie Mac Exhibits R7 & R8.* However, neither party addressed this issue so the Court will not disturb the within computation, secure in the knowledge that a $3,000.00 to $5,000.00 discrepancy is not significant in the overall calculations, nor should it be.

6. The Court treats the Debtor's stipulating into evidence the Abstract of Title, *Freddie Mac Exhibits R11 & R12,* as resolving the inconsistency between the characterization of Dr. Elstein as an equity security holder in the Debtor's Petition and then as a mortgagee in the Abstract in favor of the latter. *Compare Freddie Mac Exhibit R15 with Freddie Mac Exhibits R11, R12.*

post-petition net rents collected by Bright, after expenses, pursuant to the Consent Order. *Compare Freddie Mac Exhibit 22* (showing net monthly income of $10,230.84) *with Freddie Mac Exhibit R16* (showing daily rate of interest which on calculated on a thirty day month equals $11,518.20).[7]

Thus, the Debtor has no equity in Yorkshire Manor within the meaning of Code § 362(d)(2)(A).

■ Turning to the second prong of Code § 362(d)(2), Freddie Mac argues that the Supreme Court's recent decision in *Timbers,* requires a debtor to demonstrate that there is a reasonable possibility of successful reorganization for which retention of the secured asset is necessary. The Debtor does not quarrel substantially with this interpretation of the *Timbers* case. However, the parties do disagree on the reasonable prospect for reorganization.

According to Freddie Mac, the Debtor must fail when viewed as a reorganization. Based on the experience of its receiver, it points out that from November 1987 through October 1988, Yorkshire Manor has generated a net annual income, exclusive of payments to Freddie Mac or receiver's fees, of $122,770.08 or $10,230.84 per month, an amount that is insufficient to even pay the $138,217.62 in interest that is accruing annually on the principal of the Freddie Mac debt at the rate of $383.94 a day, let alone the monthly escrow for the annual taxes and insurance, as required under the MFM, of $4,500. *Freddie Mac Exhibits 3, 22, 29, 30.*

The Debtor, citing a monthly gross rental of $21,700, plus $3,000 to $5,000 in annual laundry machine income which it notes

was substantiated by Bright, retorts that it would be able to propose a plan to pay operating expenses and to amortize the Freddie Mac debt at the required monthly payments of approximately $11,000. Even assuming arguendo that the Debtor's unsupported annual cash flow projection of $265,400.00 is correct, it does not take into consideration how the Debtor would cure the Freddie Mac pre-petition interest arrears of $262,231.02 in any proposed plan. *Freddie Mac Exhibit R16.* Further, the Debtor's history in operating Yorkshire Manor dating back to 1979 portrays a picture of mismanagement, both physical and financial, the latter particularly exemplified by Gross' deficient record-keeping. *See, e.g., Freddie Mac Exhibit 36.*

While the Court recognizes that the Debtor may again seek refinancing that would "cash out" Freddie Mac, much the same as Troy was paid off in 1985, that avenue as a probable means towards an effective reorganization is not viable on the proof before the Court. The record indicates that the Debtor's only significant effort to refinance occurred in November 1987 when the Debtor received a letter from CSC indicating that "if" a loan were granted to the Debtor it would not exceed $1,350,000—an amount insufficient at that time to satisfy the debt due Freddie Mac as well as the cost of refinancing. *Freddie Mac Exhibit 34.* Freddie Mac directs the Court's attention to the Debtor's own appraiser's testimony, which conceded that it could not expect to secure refinancing in excess of seventy-five percent of the value of Yorkshire Manor, and that even at a value of $1,600,000, that refinancing would be inadequate to "cash out" Freddie Mac.

---

7. While cognizant of the parties' stipulation at the start of the hearing on December 5, 1988 with regard to litigating the pre- and post-petition legal fees and costs in the foreclosure as estimated in Freddie Mac's proof of claim, *Freddie Mac Exhibit R16,* if it became pertinent to the Court's determination herein, the Court is of the opinion that said fees and costs are not so out of line that Freddie Mac would not be able to establish the amounts if put to the test. In addition, Freddie Mac's $47,000.00 estimate is $2,176.72 more than the remaining "equity", thereby giving that estimate some play for unreasonableness. The Court also notes that the

post-petition interest is accruing monthly over $1,200.00 in excess of the average net monthly rents collected by Bright. *Freddie Mac Exhibits R16 & R22.* Consequently, it could well be said that as of February 13, 1989, the Debtor's "equity in Yorkshire Manor was some $4,800.00 *less,* to wit, $40,000.00, from which Freddie Mac's pre- and post-petition legal fees and costs in the foreclosure would then have to be subtracted. Therefore, in light of the foregoing demonstrating the dissipation of the remaining $44,823.28, the Court sees no reason to delay these proceedings further and set down a hearing.

The Court also notes that Moriarty's letter to Weiler on May 2, 1988 does make reference to the Debtor's submittal of a refinancing application to HFA on April 25, 1988 and the scheduling of a meeting in New York City with HFA's director. *Freddie Mac Exhibit 32.* However, the record is silent on the progress, if any, of this application.

■ Finally, the self-serving, unsupported testimony of Gross that she could commit her own funds to the extent of $1,000,000.00 or that she would list the property for sale at an asking price of $1,800,000 cannot be given any credibility by the Court inasmuch as there is no documentary or testimonial proof substantiating her purported assets. *See In re National Real Estate Limited Partnership II,* 87 B.R. 986, 991–992 (Bankr.E.D.Wis. 1988); *In re Planned Systems, Inc.,* 78 B.R. 852, 867 (Bankr.S.D.Ohio 1987); *Farmers and Mechanics National Bank v. Gilece (In re Gilece),* 7 B.R. 469, 472–473 (Bankr.E.D.Pa.1980). Evincing no more than pipe dreams and high hopes, the Debtor's principal's speculations totally fail to meet its burden of proof under Code § 362(g)(2) with respect to Yorkshire Manor being necessary to an effective reorganization *that is in prospect. Timbers, supra,* 484 U.S. at ——, 108 S.Ct. at 632 (emphasis in original). *See also American State Bank v. Grand Sports, Inc. (In re Grand Sports, Inc.),* 86 B.R. 971, 974–975 (Bankr.N.D.Ind.1988); *In re Diplomat Electronics Corp., supra,* 82 B.R. at 693; *In re Anderson Oaks (Phase 1) Ltd. Partnership,* 77 B.R. 108, 110–111 (Bankr.W.D. Tex.1987).

Turning to the Debtor's final argument dealing with an interpretation of the Supreme Court decision in *Timbers, supra,* 484 U.S. at ——, 108 S.Ct. at 626, the Court believes that it misses the mark.

■ The Debtor analyzes what must be paid to an undersecured creditor to provide "adequate protection" within the meaning of Code § 362(d)(1) and correctly concludes that the Supreme Court determined that a debtor need not adequately protect an undersecured creditor's rights to an immediate foreclosure of its security by paying interest to that undersecured creditor as reimbursement for the loss of use of the proceeds of its collateral.

The Court agrees with the Debtor's interpretation of an undersecured creditors' right to adequate protection as circumscribed by the Supreme Court in *Timbers, supra,* and acknowledges that Freddie Mac may indeed have an "equity cushion", albeit slight, when $104,262.00, the amount of the accrued income, less expenses and fees retained by Bright as of the date of the petition, is added to the appraised value of Yorkshire Manor.[8] *See In re Mellor, supra,* 734 F.2d at 1400 & n. 2. However, Code § 362(d) speaks in the disjunctive. Thus, although Freddie Mac may be adequately protected for the present, such a finding will not defeat Freddie Mac's request for a lifting of the stay on the basis of Code §.362(d)(2). *See In re Diplomat Electronics Corp., supra,* 82 B.R. at 692 (citing Bienenstock,·*supra,* at 133).

The issue`here is whether or not the Debtor has any " 'reasonable possibility of a successful reorganization within a rea-

---

8. The Court notes that the resultant eight percent equity cushion—the percentage of the value that is the difference between Freddie Mac's claim of $1,284,858.87 and Yorkshire Manor's fair market value of $1.4 million—is barely the kind of cushion courts have equated to satisfy adequate protection under Code § 362(d)(1), separate and apart from the "lost opportunity cost" issue addressed in *Timbers* and especially where it is unaccompanied, as here, by any offer of periodic payments or replacement liens pursuant to Code § 361(1,2). *See In re Jug End In The Berkshires, Inc., supra,* 46 B.R. at 899 (surveying court decisions with regard to the size of equity cushions).

Moreover, as indicated earlier, any rents accumulated between the date of filing and the date of entry of this Order are, after expenses, basically set off by the accrual of interest at $383.94 per diem due to Freddie Mac's oversecured status as set out in Code § 506(b), with the interest exceeding the rents at a rate of about $1,200.00 per month. The Court also observes that the record is silent on whether or not Yorkshire Manor is depreciating in value, a consideration to be weighed in the any form of adequate protection analysis under Code § 362(d)(1), including that of an equity cushion. *See In re Planned Systems, Inc., supra,* 78 B.R. at 861–862.

sonable time' ". *Timbers, supra,* 484 U.S. at ——, 108 S.Ct. at 632 (quoting *id.* at 808 F.2d at 370–371 & citing *id.* at nn. 12–13). If that inquiry is answered in the negative, as it must be herein, then the stay must be lifted and the creditor given the right to retake its collateral under applicable state law.

The Court recognizes that this motion has been made early on in the Debtor's case, and that, generally, a court will allow the debtor "breathing room" in its exclusive period of plan filing under Code § 1121(b) so as to give that debtor an opportunity to formulate a plan which will benefit its general unsecured creditor body, unfettered by the threats of secured creditors. *See Timbers, supra,* 808 F.2d at 372. *See also In re Anderson Oaks (Phase I) Ltd. Partnership, supra,* 77 B.R. at 111 (citing to *In re Island Helicopter Corp.,* 63 B.R. 809, 815 (Bankr.E.D.N.Y.1986)); *In re Planned Systems, Inc., supra,* 78 B.R. at 866. However, no significant unsecured creditor body exists in this case and there is no good reason to delay the inevitable— the inability of the Debtor to operate its sole asset without the assistance of a receiver and/or an infusion of capital to enable it to move towards an effective reorganization, be it rehabilitation or liquidation. *See Timbers, supra,* 484 U.S. at ——, 108 S.Ct. at 632–633 & nn. 1–2; *In re Copy Crafters, Inc., supra,* 92 B.R. at 985– 986; *Homestead Savings & Loan Association v. Associated Investors Joint Venture (In re Associated Investors Joint Venture),* 91 B.R. 555, 558 (Bankr.C.D.Cal. 1988); *In re National Real Estate Ltd. Partnership II, supra,* 87 B.R. at 986.

Indeed, the filing by the Debtor of a plan on February 2, 1989, one week prior to the expiration of its exclusive period to do so, does not lead the Court to a different conclusion. In rendering its decision on the motions before it, the Court can only consider the record as developed by the parties at the hearing. The act of filing a plan after the proof is closed, absent some mo-

tion by the proponent to reopen that proof, does not bring the plan before the Court for inclusion in its analysis on the pending motions.

While Yorkshire Manor is clearly property that is necessary to the Debtor's reorganization, the facts prior to and subsequent to the filing of the petition, as developed on the record, do not depict an effective reorganization that has a possibility and prospect of realization in a reasonable period of time within the meaning of Code § 362(d)(2)(B) as construed by the Supreme Court in *Timbers,* which must be a threshold determination. *See Bankruptcy Reorganization, supra,* at 136 & n. 94. *Cf. In re Bergman,* 585 F.2d 1171, 1179 (2d Cir. 1979) (construing test of feasibility under Chapter XII of the Bankruptcy Act of 1898). There has been no broad outline addressing a means of implementation to reverse the Debtor's negative cash flow and provide it with necessary operating expenses or, in the alternative, to liquidate nor has there been offered any "map which charts a path through Chapter 11 to a successful reorganization." *In re Grand Sports, Inc., supra,* 86 B.R. at 975. *See also In re Planned Systems, Inc., supra,* 78 B.R. at 866.

Rather, the Debtor clings to a vision that is neither workable nor attainable based upon the very facts in the record. *See Timbers, supra,* 808 F.2d at 373; *In re Missouri Flats, supra,* 86 B.R. at 638. "[W]here it appears that the proposed arrangement cannot be effected as a matter of law, then it would be equally unwise to permit the case to proceed any further." *In re Anderson Oaks (Phase I) Ltd. Partnership, supra,* 77 B.R. at 111.

Accordingly, the Court will deny Freddie Mac's motion to dismiss the case pursuant to Code § 1112(b) or to lift the stay pursuant to Code § 362(d)(1), but will grant Freddie Mac's motion to lift the stay pursuant to Code § 362(d)(2).[9]

---

9. The Court takes the position that the movant waives the expedited time frame provided by Code § 362(e) when, as here, it requests separate relief in addition to relief from the automatic stay.

Having reached this conclusion, the Court need not reach that portion of Freddie Mac's motion seeking continuation of the state court receivership since that decision is now within the province of the State Court, having been presumably extended on the parties' consent to the Court's resolution of the instant matter.

The Court will also, *sua sponte*, enter a Final Decree of the Debtor's still-pending and substantially consummated Chapter 11 case, Case No. 81–00173, in accordance with its inherent power of case management as authorized by Code § 105(a).

IT IS SO ORDERED.